EDWARD KLINE, Plaintiff, *v.* ROBERT M. MCBRIDE & COMPANY, INC., and EDWARD LEVINSON, Defendants.

Supreme Court, Special Term, New York County, April 20, 1939.

*Jenks & Rogers [Gustavus A. Rogers* and *Jerome A. Lawrence* of counsel], for the plaintiff.

*Field & Field [Reginald Field* of counsel], for the defendants.

COTILLO, J. This action is brought by the plaintiff seeking an injunction against the author and publisher of the volume " I Break

Strikes " on the ground that the publication of same is a violation of section 50 of the Civil Rights Law. In addition, damages are sought for the alleged shame, humiliation, ridicule and alleged injuries that followed unwarranted publication.

An interesting question is raised for the first time, so far as the publication in book form is concerned, with respect to section 50 of the Civil Rights Law.

Precedents with respect to the publication of pictures by radio, newspapers and magazines have found their way in our law reports, but in the instant case we are concerned with a permanent publication in book form and concerning a subject-matter of emphatic current social interest.

The Civil Rights Law is more popularly known as the Right of Privacy statute. Section 50 states: " Right of privacy. A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of misdemeanor."

Section 51 states: " Action for injunction and for damages. Any person whose name, portrait or picture is used within this State for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the Supreme Court of this State against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion, may award exemplary damages. But nothing contained in this act shall be so construed as to prevent any person, firm or corporation, practicing the profession of photography, from exhibiting in or about his or its establishment, specimens of the work of such establishment, unless the same is continued by such person, firm or corporation after written notice objecting thereto has been given by the person portrayed."

The statute in question was passed in 1903. It came as a result of a suggestion contained in *Roberson* v. *Rochester Folding Box Co.* (171 N. Y. 543), where it was stated that there is no common-law right of privacy and that the use of a photograph in an advertisement gave rise to no cause of action in the absence of statutory authority. Following this case, and the first to test the statute, came Judge BARTLETT's opinion in *Rhodes* v. *Sperry & Hutchinson*

*Co.* (193 N. Y. 223, 226). There it was said that " In the case of *Roberson* v. *Rochester Folding Box Co.* (171 N. Y. 538) this court determined that in the absence of any statute on the subject the right of privacy as a legal doctrine enforcible in equity did not exist in this State so as to enable a woman to prevent the use of her portrait by others for advertising purposes without her consent. * * * Chapter 132 of the Laws of 1903 was passed at-the very next session of the Legislature after this judicial utterance was made public and there can be little doubt that its enactment was prompted by the suggestion which I have quoted."

Later cases involved a series of acts, all illustrating the use and purposes of the statute. The case of *Colyer* v. *Fox Publishing Co.* (162 App. Div. 297) involved the publication of the picture of a theatrical performer in a single issue of the *Police Gazette*. The court there called attention to the fact that the language of the statute is very general and is susceptible to a wide meaning and holds that its applicability can only be understood in the light of its history and the evil at which it was aimed. It calls attention to the fact that in every reported decision in which a judgment for damages has been upheld, the prohibited use of the name and photograph was clearly for advertising or trade purposes and that a publication in a periodical or magazine has never been prohibited.

In *Jeffries* v. *New York Evening Journal Pub. Co.* (67 Misc. 570) the Special Term held section 50 to be a remedial provision and must be confined in construction to a reasonable interpretation of its language. In the trial judge's opinion a picture " is not used for advertising purposes " unless the picture is part of an advertisement, while trade refers to commerce or traffic, not to the dissemination of information.

In *Ellis* v. *Hurst* (70 Misc. 122) Judge GREENBAUM considered the use of a person's name in the publishing of a book without his permission, where it was incidental to a proper publication of a work which the defendants owned; and the court stated that it had serious doubts whether section 50 of the Civil Rights statute was intended to cover every case of the unauthorized use of another's name, picture or portrait in connection with trade purposes, or whether it was intended to be limited to a class of cases where, before the enactment of the statute, no provision of law existed for redressing certain wrongs. It went on to say, in interpreting said section: " The act was evidently designed to forbid the unauthorized and wanton appropriation or use of a person's name, picture or portrait for trade or advertising purposes where such use is wholly unrelated to the matters or things with which said name, picture or portrait is associated, and it may perhaps also have been

intended to forbid the unauthorized use of one's name, portrait or picture when such use is asserted to be related to or connected with the things advertised or sold, but where such a relationship or connection is, in fact, unreal, unsubstantial, pretended, or false."

In *Humiston* v. *Universal Film Mfg. Co.* (189 App. Div. 467) the Appellate Division reversed the judgment in favor of the plaintiff based on the cause of action because of the publication of a newsreel dealing with professional activities of the plaintiff. That opinion points out that the representation of the plaintiff was a matter of current news and general interest, and holds that such a use is not forbidden by the statute. It further added that the use of the plaintiff's name on a poster or billboard advertisement advertising the exhibition of the film was not unlawful because incidental to the proper use of her name or portrait in the film itself.

*Damron* v. *Doubleday, Doran Co., Inc.* (133 Misc. 302; affd., 226 App. Div. 796), is a case dealing with the popular novel "Show Boat," the author of which had employed the name of a living person in one scene of the book. The opinion holds that the law was not passed with the idea of interfering with the circulation of newspapers or the publication of books within proper limits. It holds further that in considering whether the name or likeness has been used primarily for advertising or trade, the circumstances, the extent, degree or character of the use, must all be weighed by the court. The opinion ends with these words: "It would indeed impose uncalled-for burden and hazard were we to hold that publishers and book sellers could not lawfully publish or deal in books without the production of genuine written consents from every one mentioned even once, or that an author could not lawfully mention any one without like consent."

In the case of *Martin* v. *New Metropolitan Fiction, Inc.* (139 Misc. 290; affd., 234 App. Div. 904), a fictionalized act of a murder trial was published. The trial court there ruled that "Apparently legitimate use of names and pictures in commercial enterprises depends upon the purpose, viewing the matter from the standpoint of reaction of the public rather than from the standpoint of the person who uses them. Names and pictures are legitimately used in connection with mere items of news, with matters of history of public men and events, and with matters which are submitted to the public in a way which invites public comment. Even private social affairs and prevailing fashions involving individuals who make no bid for publicity are, by custom, regarded as public property where the apparent use is to convey information of interest and not mere advertising."

Section 8 of article 1 of the Constitution of the State of New York provides that "Every citizen may speak freely, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no law shall be passed to restrain or abridge the liberty of speech or of the press."

We know that this statement must be considered in the light of various exceptions. While it makes out in specific language a case of free speech, unlimited excepting for "the abuse of that right," that phase has been given precise interpretation. (*People* v. *Most*, 171 N. Y. 423; *People* v. *Gitlow*, 234 id. 132.)

This court is of the opinion that section 50 of the Civil Rights Law does not prohibit the publication in a non-fiction book of matters dealing incidentally with specific persons and concerning things of current interest. In taking this stand the court is persuaded that Judge STALEY's words, namely, that names and pictures are legitimately used in connection with mere items of news, are sound; that Judge GREENBAUM's words that the act was evidently designed to forbid only the unauthorized and wanton appropriation or use of a person's name, where such use is wholly unrelated to the matters or things with which such name, picture or portrait is associated, are also sound.

Furthermore, the court is convinced that the publication, of which the plaintiff complains, does not require the protection afforded by the exception stated within section 8 of article 1 of the Constitution of the State of New York. The liberty of the press consists of the right to publish, with impunity, truth, with good motives and for justifiable ends, whether it concerns governments, magistracy, or individuals. (*People* v. *Most*, 171 N. Y. 423.)

In arriving at these above-stated conclusions the court states its conviction that the use of the plaintiff's name throughout the volume "I Break Strikes" is incidental and not a primary consideration in the treatment of the subject-matter of professional strikebreaking. Permanency as argued by the plaintiff, when contrasting a book with such device or channels as pictures, newspapers, radio, is not absolute but relative. Common sense dictates that the propriety of extending to publications the exception allowed to relatively less permanent forms such as newspapers, pictures or radio, affords in itself no true or absolute test regarding the plaintiff's propriety of conduct. The true test must remain as always that stated by Judge STALEY in *Martin* v. *New Metropolitan Fiction, Inc.* (139 Misc. 290; affd., 234 App. Div. 904).

One is struck by the parallelism between the social evils described in the Bergoff biographical data printed in this book and the existing social evils of an earlier industrial era. These latter evils also were

based upon the lack of government regulation of social and industrial relations. I refer to the evils behind the unregulated issuance of bail bonds, the lack of proper licensing of ten-cent dance halls, the lack of government supervision of so-called steamship agents who acted as private bankers and received immigrants' remittances to send abroad. I could add appropriately to the list all the evils of the " padrone labor " system which went unheeded for a long time, and the widely prevalent sweatshop evils long countenanced by an inadequately regulated industrial New York.

These illustrations may be considered as only partially portraying a picture of a society fortunately changed today, but which the pen of the author of this book left all too incomplete. The author limited himself, obviously, to those aspects which related specifically to labor relations.

Not without truth are the statements published by the La Follette Senate Committee concerning the extent of the evils of professional strike breaking. A preliminary report of that committee, published pursuant to Senate Resolution No. 266 (74th Congress, Report No. 2046), among other things said the following: " Far more powerful and less subject to control than professional agencies, the private police force appears to be more sinister and because of it, the grand jury may fail to throw around him the protective process of the law." The La Follette Committee had this to say: " A well defined caste system exists within the ranks of strike breakers. The foreman is a noble. Privates are known as finks or guards. Finks should not be confused with scabs who attempt to break strikes by taking their jobs from striking workers. The word ' slugger ' defines itself. A roper is less well-defined, the term being used to describe a shadower, informant and hooker. A still further variety of strike breaker is the missionary who travels from door to door, usually in the role of salesman, and talks derogatorily of the strike to the strikers' families in order to break down their morale."

More specifically referring to the criminal records of strikebreakers, the La Follette report stated that many of these professional strikebreakers were drawn from the underworld; that large numbers of such men have criminal records. It further stated that organizers of the agencies and principal officials are not infrequently ex-convicts. Arrests of strikebreakers *en masse* invariably reveal fair percentages of men who are fugitives from justice. Gangsters sometimes come up through strikebreaking, and as heads of political ranks ofttimes retain an interest, sometimes vested, in strike breaking for a section of an industry or of a city. Some of the most distinguished detectives with letters of recom-

mendation from corporations of greatest wealth have their faces and fingerprints in rogues' galleries.

In a National Labor Relations Board report which concerned the activities of labor detective agencies, such as that with which this plaintiff was substantially connected, it was stated that " Since violence is to their advantage, they have instigated or directly created violence. Their operatives have been convicted of violence in the past. The same agencies are to day equipped to do the same things." Most important, continues this statement in the National Labor Relations Board report and referring to the lack of regulation of such activities in which the plaintiff bore a part, it is added: " These union breaking agencies are subject to no Federal regulation or even inspection. Their methods are secretive. Their financing and control are largely hidden. Their operatives deal in aliases, forged credentials and impersonated police powers."

Despite its extensive dramatic color or sensationalism, the fact remains that here exists a social evil which this book sought to have the public recognize under its true colors.

The defendant author has arrestingly focused public attention on the type of persons who yesterday, if not today, predominantly made up the coterie of dominating personalities in the " strikebreaking era " of industrial America twenty-five years ago. The fact that an unforseeing community permitted the professional strikebreaker a wide hand, free of legal restraint, is not to be construed as having granted to such groups the right to perform anti-social or even illegal acts; nor was a condonation even intended of acts regarded as inimical to the public welfare. More truly it may be said that the experience encountered fortifies our already existing knowledge of the unfortunate inertia found throughout many of our States in taking a benevolent attitude towards these professional strikebreakers and permitting such attitudes to continue all too long.

The defendants contend that constitutionally they are free to express their opinions on any topic, subject to damage suits under the law of libel and slander; that they have freedom to do so unhampered by any reservation. This statement is not true, nor do the defendants need to rely on the accuracy of any such statement.

Thus the constitutional guaranty of free speech did not permit Gitlow to publish a pamphlet advocating anarchy. (*People* v. *Gitlow*, 268 U. S. 652.) Likewise, the recent bund meeting held at Madison Square Garden on February twentieth raised the question of free speech, today obviously a question of great moment, and the authorities properly ruled here that such a meeting, if conducted orderly, would have to be held, else free speech in a democracy must degenerate into mere words.

The argument is advanced by the plaintiff that free speech does not carry the right to hold up a person to shame, humiliation and ridicule. There is a logical, practical, as well as legal, answer to this. The free speech guaranteed by the Constitution is not an abstraction; it has no being apart from reality. Free speech in the abstract is meaningless; it must always be considered in connection with political reality. What is political reality? Under political reality we have abrogated the right of free speech from time to time and survived. Thus, in an absolute sense, free speech does not exist and probably never existed at all.

Absolute liberty must be considered in the same light. We do not have absolute liberty; we do have " ordered " liberty. Thus, if at a public meeting which involves the right of the public to attend, one of the listeners insists on expressing his disagreement with what the speaker says, he would be violating a right guaranteed to the speaker. (Penal Law, § 1470.) The right of the opposition in such a case would be limited to hiring another hall and expressing its opposition doctrine there.

When the bund meeting, heretofore referred to, was held, the right of assemblage, together with the right of free speech therein exercised, was involved. But these were rights which were strictly hedged about, and it is this necessity for adequate " hedging " which the author depicts as a problem of immediate social interest.

If the right to " peaceably assemble," as both the Federal and New York State Constitutions put it, means anything, it never meant the right to bear arms or assemble in such areas that the meeting in itself is a threat of force or the speech uttered a defamation. The strikebreaking activities of Bergoff and his aids, in which the plaintiff took part, did both. They included the bearing of arms and the massing of men in concentrated areas so that the mere presence of such groups constituted a menace of force. And it is the social necessity for the regulation of such menaces which this publication describes and which cannot by any stretch of the imagination be considered as intended to be barred by the right of privacy statute.

The sponsors of that statute clearly did not have in mind such examples as Bergoff's and Klein's activities afforded. It is for this reason that I can subscribe to the words of Judge CHASE, of Judge STALEY and of Judge GREENBAUM, all of whom clearly had these same elements to consider. Although their theory of law did not apply to a publication in book form, I feel sure that by their reasoning, their judgment would nevertheless have included it had the occasion required.

Because the right of free assemblage runs throughout almost parallel in all its social and legal consequences with the right of

free speech, I desire to avail myself of the opportunity to discuss same, especially since the former bears such a direct relationship to the use of arms by professional strikebreakers.

In the French Constitution of 1791 is listed the liberty of the citizens to assemble peaceably and without arms. The Declaration of Rights of 1793 asserted " the right of assemblage peaceably; " and the Constitution of the year III declared that every armed mob is an attack on the Constitution. Does not this illustration bearing in mind the topic described in " I Break Strikes," so far as it relates to mobs of armed strikebreakers, represent an invasion of civil liberties? And is it illegal or barred by the Right of Privacy statute to discuss this under the right of free speech?

It would surely be no restriction of our civil liberty to prohibit the use of private arms and private uniformed groups. If this be so, it can scarcely be less legal to write about them, to publicize their conduct and inform people generally of their effect on the social welfare.

The Right of Privacy statute says nothing about limitations. Its purpose as a remedial statute is clearly designed to stop the merchandising in the channels of normal trade of a portrait of a person who occupies a position in which there is monetary value by publicizing same.

Significantly related to the labor topic to which this book is devoted is our determination today to make equal the potentialities for bargaining between capital and labor. This objective was distinctly absent among us during the epoch described in the volume, " I Break Strikes." One of the best means of accomplishing such objective is to regard with sympathy and understanding the available literature which lifts the lid on the hitherto dark recesses of a chapter happily now rapidly disappearing.

Tomorrow's mistakes can be best avoided or minimized by understanding the pitfalls of yesterday's struggles. This book tells the American public of a sordid chapter in past American industrial relations; it describes a page in which during a period of too rapid industrialization the powers that be listened unheedingly to the preservation of human values. It permitted and even legalized the ruthlessness of hired strikebreakers and their ilk, even when operating with gun play and when it concerned the association of under-world characters whose reputations were none too savory and whose pictures are often found in police picture galleries.

The main story of " I Break Strikes " relates to Bergoff, but even more significant, these chapters on strikebreaking bear distinct similarity to the whiplashings against labor when labor's defenders were fewer than they are today.

In the face of these social facts the plaintiff's stand in this suit is ill-taken; the story of his activities fits only incidentally into this sordid picture, as I have stated. By that token I cannot be persuaded that the plaintiff has proved the violation of any right or any trespass upon his privacy through the publication of this book.

Instead of a government publication buried in dusty archives which few read, this popularized presentation of an important early labor chapter which is rapidly, if not altogether, disappearing, treating of Bergoffs, is conveniently perpetuated in book form for future sociological research.

I shall deny the relief demanded, dismiss the complaint, and allow judgment for the defendants.