[Civ. No. 43527. Second Dist., Div. Five. Dec. 13, 1974.]

DOUGLAS WILLIAM JOHNSON et al., Plaintiffs and Appellants, v. HARCOURT, BRACE, JOVANOVICH, INC., et al., Defendants and Respondents.

**COUNSEL**

Arthur S. Katz and Marvin H. Kleinberg for Plaintiffs and Appellants.

Kaplan, Livingston, Goodwin, Berkowitz & Selvin and Peter C. Smoot for Defendant and Respondent.

**OPINION**

**STEPHENS, Acting P. J.,** — This is an appeal from a judgment sustaining defendant's demurrer without leave to amend plaintiffs' complaint. Plaintiffs (Douglas William Johnson and other members of his family, Helen,

Richard, Clement, and Dorance)[1] filed suit on December 29, 1972, against defendants (Harcourt, Brace, Jovanovich, Inc. (publishers) and William F. Smith and Raymond Liedlich (authors of the textbook), alleging that defendants had invaded their right of privacy by republication of an article from The Nation magazine in a college English textbook published in 1965. The authors have not appeared in this action.

We are faced with two issues: (1) whether plaintiffs' complaint states a cause of action; and if so (2) whether the cause of action is barred by the statute of limitations.

There is no dispute as to the underlying facts involved in this case. On March 10, 1961, plaintiff Douglas William Johnson, a Negro janitor, found a sack containing $240,000 in cash lying on a street in Los Angeles. He reported his discovery to the authorities and was given a $10,000 reward for his action by Brink's, Incorporated, which had lost the money in transit. Several magazine articles recounted the experiences of the Johnson family after the incident. One such article, entitled "Unexpected Rewards," was published in the June 1963 issue of The Nation magazine.[2] In 1965, defendants reprinted this article with the author's permission as a part of a teaching exercise in a college English textbook entitled "From Thought to Theme," subtitled: "A Rhetoric and Reader for College English." Plaintiffs first learned of the republication of the article on April 17, 1972, when an acquaintance of William Johnson's whose son had used the English textbook in college, showed the republication[3] to him.

---

[1] The right of privacy is a purely personal one, fashioned to protect an individual's solitude. (*Metter* v. *Los Angeles Examiner,* 35 Cal.App.2d 304 [95 P.2d 491].) In the instant case, the members of the Johnson family are not asserting that they are entitled to recover solely on the basis that their father's right of privacy was invaded, but rather have averred that their own right of privacy was violated by the republication of the article.

[2] It is not alleged that the first publication injured the plaintiffs.

[3] The republication as it appeared in the textbook, in pertinent part, reads as follows:

"Unexpected Rewards of Virtue" by Fred J. Cook

"Like the preceding selection, this one deals with the problems and pressures which a man faces when through some quirk of fate he suddenly finds a small fortune thrust into his hands, a fortune belonging to someone else. There is a considerable difference in the way the subject of each article responds to his situation, but it is interesting to note the similar pattern of public reaction.

"The introduction to the two articles are quite comparable, but the conclusions differ in that Cook adds a suggestion of the larger social significance of incidents such as these.

"(1) On March 10, 1961, Douglas William Johnson, a fifty-year-old Negro janitor in Los Angeles, a man who had felt the pinch of poverty, drove to an apartment house under construction to see if he could get the job of cleaning up the debris. With him was his wife, Helen, thirty-eight. The superintendent whom he had to see

## The Complaint

For its first cause of action, plaintiffs alleged in pertinent part as follows:

"7. The publication of said textbook article was deliberately concealed from plaintiffs by defendants who neither sought nor obtained plaintiffs' consent jointly or severally, to use plaintiffs' individual names, identities, experiences and stories in defendants' college English textbook."

---

about the debris-cleaning chore wasn't at the site, and so Johnson climbed back into his station wagon and started home. He had driven only a short distance when he happened to see, lying in the street in front of his car, a bulky canvas bag. Thinking it might contain something useful, Johnson stopped, picked it up and tossed it into the back of the station wagon.

"(2) As he got behind the wheel and drove off, his wife, possessed by curiosity, turned around and began to examine the bag. It was sealed, but it bore a tag. The tag said that the bag contained $240,000 in $10 and $20 bills.

"(3) 'Do you know what you've picked up?' Mrs. Johnson asked her husband. 'There's $240,000 in that bag!'

"(4) 'No!' he said—and started to shake all over.

"(5) Explaining his reaction later, Johnson told reporters: 'I was knocked off my feet. I never dreamed I'd have my hands on anything like that.'

"(6) Here certainly was king-sized temptation. Bills of relatively small denominations are not easily traced, and Johnson—the part-time maintenance man, father of three sons—had $240,000 worth of those bills at his finger tips. What to do?

"(7) 'I thought if I kept that money I'd never be able to look my three kids in the face again,' Johnson explained, using the simplistic imagery of a bygone age when man had stature and was supposed to be responsible for his acts.

"(8) So Johnson acted according to the dictates of pure and simple honesty. As soon as he reached home, he telephoned a friend, a former Chicago policeman, to find out whom he should notify about the money; the friend advised him to call the FBI. He did. In minutes, four FBI agents were at his door, recovering the money bag that had fallen from the rear of a passing Brinks truck. The truck had traveled for some distance before the $240,000 loss was discovered and scores of police and FBI agents had begun to search along the truck's route when Johnson telephoned that he had the missing money.

"(9) Brinks paid Johnson a $10,000 reward for his honesty, but this wasn't the end of the story. A little more than a month later, on April 21, 1961, the press of the nation recorded the sad and revealing sequel. Johnson's life had been made utterly miserable: the strictly honest deed that should have made him the most admired of men had made him instead the most despised, ridiculed and harassed.

"(10) Crackpots wrote obscene letters to him, neighbors ridiculed him, fellow workers needled him, schoolmates taunted his sons. The universal theme was that Johnson had proven himself to be the world's greatest boob by returning that $240,000 once he had it in his hands. The taunts became too much for his oldest son, Richard, sixteen, who finally ran away from home, returning after a few days, hungry and disillusioned. 'The kids kept saying things to me,' he explained, 'All the time, they were saying my father was dumb, and a fool and stupid. . . . I just couldn't stand it.'

"(11)Johnson himself said it was 'nice' that Brinks had given him a $10,000 reward, but he added:

"(12) 'I can't leave the house to get to work without someone throws it all up to

"8. Plaintiffs discovered defendants' unauthorized use of their names, identities, experiences and stories in said textbook article on April 17, 1972 . . ."

"9. As a direct consequence of plaintiffs' discovery of defendants' unauthorized publication, for commercial purposes, of plaintiffs' names, identities, experiences and stories, each of the plaintiffs has been embarrassed, humiliated, and exposed to public ridicule, and each has suffered mental distress, and the individual privacy of each plaintiff has been unwarrantedly invaded."

"11. Defendants, and each of them, did the things herein alleged maliciously, and oppressively, and each plaintiff is therefore entitled to recover exemplary damages. . ."

me and calls me a fool. Can't be on the job without someone says, "Why you need work? You had $240,000." And now it's hurting my boys.

"(13) 'I wish I'd never seen any of it. I wish we'd let that money sit in the street and rot. I wish we'd thrown it down a sewer or burned it.

"(14) 'That money? It's not worth anything. It has made me a poor man.'

"(15) . . . In a monied society, Douglas Johnson had committed the cardinal sin; acting on honest impulse, he had returned a fortune he might have kept.

"The following 'postscript' to 'Unexpected Rewards of Virtue' appeared in an article in the April 27, 1963 *Saturday Review* entitled 'Sweet, Spontaneous Humanity' by Hallowell Bowser.

". . . Eventually, news of the Johnsons' plight got out, and suddenly public sentiment changed. Now encouraging letters poured in, some of them addressed simply to 'Honest Man, Los Angeles, California.' Both neighbors and strangers began dropping in to say sheepishly that they had at first thought Johnson was a fool, but that the force of his example had made them change their minds.

"When President Kennedy heard of the family's ordeal he wrote to Johnson: 'I want to extend my personal commendation for your unflinching honesty. . . . I have read news reports of the incident and regret the unfortunate few who have since harassed you and your family.'

"But what if lightning should strike twice? After his ordeal, would Johnson take a more 'realistic' view of things? The question was answered recently when a firm sent Mr. Johnson a money order of $90,036 instead of the $36 he had arranged for. He promptly returned the order, saying, 'I could sure use that money, but not enough to get it the wrong way.'

"DISCUSSION AND WRITING

"1. Compare men about whom this article and the preceding one were written. Which one acted in the most typical manner? What is the basis for your answer?

"2. *Why would anyone consider Johnson a fool for returning $240,000 to its rightful owners? Do you? Why or why not?* [Italics added.]

"3. How do you feel about the Brinks Company granting Johnson $10,000 reward? Is it too much, too little, or should he not have been given anything? Support your answer.

"4. Compare the general public reaction described in each of these articles. Do you believe that these reactions reflect anything about the sense of values of modern Americans? If so, what conclusions do you draw and why?

"5. Do you think the brief follow-up item appended to this selection reflects the public attitude more accurately than the article itself? Why or why not?"

For its second cause of action, plaintiffs alleged in pertinent part as follows:

"13. With full knowledge of plaintiffs' rights to control the use and publication of their individual names, identities, experiences and stories, and in wilful and deliberate disregard thereof, and without the authority or consent of plaintiffs, or any of them, said defendants infringed upon plaintiffs' right and used plaintiffs' individual names, identities, experiences and stories in defendants' college English textbook and deliberately concealed such use and publication from plaintiffs.

"14. Reasonable compensation for the use and publication of each of plaintiffs' individual names, identities, experiences and stories, as aforesaid, is Ten Thousand Dollars . . ."

The prayer of the complaint seeks compensatory and exemplary damages in specified amounts for each cause of action and against each defendant.

Plaintiffs contend that the trial court erred in sustaining defendants' demurrer without leave to amend.

### Discussion

■ We proceed to examine plaintiffs' complaint for its legal sufficiency according to the well-settled principle that if upon consideration of all the facts alleged in the complaint it appears that the plaintiffs are entitled to any relief at the hands of the court, the complaint must be upheld. (*Gruenberg* v. *Aetna Ins. Co.,* 9 Cal.3d 566, 572 [108 Cal.Rptr. 480, 510 P.2d 1032].) As the Supreme Court stated in *Barquis* v. *Merchants Collection Assn.,* 7 Cal.3d 94, 103 [101 Cal.Rptr. 745, 496 P.2d 817], "we are not limited to plaintiffs' theory of recovery in testing the sufficiency of their complaint against a demurrer, but instead must determine if the *factual* allegations of the complaint are adequate to state a cause of action under any legal theory. The courts of this state have, of course, long since departed from holding a plaintiff strictly to the 'form of action' he has pleaded and instead have adopted the more flexible approach of examining the facts alleged to determine if a demurrer should be sustained. [Citations.]"

*First Cause of Action:*

Plaintiffs' first cause of action is based on the emerging tort of invasion of privacy. However, it is not clear from the face of the complaint under which category of invasion of privacy plaintiffs' claims are based. The concept of a legal right to privacy was first generated by Warren and

Brandeis in their landmark law review article entitled *The Right to Privacy* published in 1890.[4] According to Dean William Prosser in his treatise on torts, this right of privacy is composed of four distinct forms of tortious invasion: (1) unreasonable intrusion upon the plaintiff's seclusion or solitude, or into his private affairs (see, e.g., *Dietemann* v. *Time, Inc.* (9th Cir. 1971) 449 F.2d 245);[5] (2) publicity which places the plaintiff in false light in the public eye (see, e.g., *Briscoe* v. *Reader's Digest Association, Inc.,* 4 Cal.3d 529 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]);[6] (3) public disclosure of true, embarrassing private facts about the plaintiff (see, e.g., *Briscoe, supra*); (4) appropriation of plaintiff's name or likeness for commercial purposes (see, e.g., *Fairfield* v. *American Photocopy etc. Co.,* 138 Cal.App. 2d 82 [291 P.2d 194]). (Prosser, Law of Torts, § 117, pp. 804-814; Prosser, *Privacy,* 48 Cal.L.Rev. 383; Rest. 2d Torts, § 652A (Tent. Draft No. 13, 1967).) Plaintiffs' first cause of action appears to be based on the last three categories.

### a. *Public Disclosure of Private Facts:*

In *Briscoe* (1971), the leading case in this category, the Supreme Court overruled the sustaining of a demurrer and held that a person previously convicted of a crime had stated a cause of action for invasion of privacy where he alleged that the defendant's publication had unnecessarily identified him by name in an article which defendant published in 1968 entitled "The Big Business of Hijacking," which detailed various incidents of truck hijackings throughout the country. As an example of the "typical" hijackings, *one* sentence in the article described an unsuccessful hijacking attempt and specifically identified the plaintiff, Marvin Briscoe, as one of the hijackers.[7] There was no indication that the attempted hijacking occurred in 1956, approximately 12 years before the complained-of publication. Plaintiff contended that—conceding the truth of the facts published in the article

---

[4]Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193.

[5]For a thorough discussion of this category of the tort, see Note, *Invasion of Privacy by Intrusion: Dietemann* v. *Time, Inc.,* 6 Loyola L.Rev. 200.

[6]In *Kapellas* v. *Kofman,* 1 Cal.3d 20, 35, fn. 16 [81 Cal.Rptr. 360, 459 P.2d 912]), the Supreme Court indicated that "false light in the public eye" is just a euphemism for libel and that a party who relies on this category must therefore satisfy the requirements of a libel claim. (See Civ. Code, § 48a as to necessity of demand for a retraction.)

[7]"Typical of many beginners, Marvin Briscoe . . . stole a 'valuable-looking' truck in Danville, Ky., and then fought a gun battle with the local police, only to learn that they had hijacked four bowling-pin spotters." (*The Big Business of Hijacking,* Reader's Digest (Jan. 1968) 115 at p. 118.) This article was a condensed version of an article which originally appeared in the December 10, 1967, issue of a magazine published by Chicago American Publishing Company. As is the case here, it was not alleged that the first publication injured Briscoe.

and that the subject matter of the article may have been newsworthy—the public disclosure of his name in conjunction with his prior criminal activity violated his right to privacy. The court upheld plaintiff's contention, stating that although Reader's Digest had the constitutional right to report the facts of plaintiff's criminal act, it did not have the concomitant right to use plaintiff's name in connection with the article. The court reasoned as follows (at pp. 537-539): ". . . [I]dentification of the *actor* in reports of long past crimes usually serves little independent public purpose. . . . Unless the individual has reattracted the public eye to himself in some independent fashion, the only public 'interest' that would usually be served is that of curiosity.

"There may be times, of course, when an event involving private citizens may be so unique as to capture the imagination of all. . . . [P]urely *private individuals may by an accident of history lose their privacy regarding that incident for all time.* There need be no 'reattraction' of the public eye because the public interest never wavered. . . . [I]n each case it is for the trier of fact to determine whether the individual's infamy is such that he has never left the public arena; we cannot do so as a matter of law. [Italics added.]

". . . . . . . . . . . . . . . . . . .

"Another factor militating in favor of protecting the individual's privacy here is the state's interest in the integrity of the rehabilitative process. . . .

". . . . . . . . . . . . . . . . .

"One of the premises of the rehabilitative process is that the rehabilitated offender can rejoin the great bulk of the community from which he has been ostracized for his anti-social acts. In return for becoming a 'new-man,' he is allowed to melt into the shadows of obscurity."[8]

---

[8]We are cognizant of the recent U.S. Supreme Court opinion in *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997]. where the court refused to extend the *New York Times* privilege to private individuals. In an opinion authored by Justice Powell, it rejected its earlier ruling in *Rosenbloom* v. *Metromedia,* 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811] where the court (in a plurality opinion written by Justice Brennan) concluded that the constitutional protection should extend to defamatory statements relating to private individuals if the statements concerned matters of general or public interest. *Gertz* involved the trial of a Chicago policeman for the shooting death of a youth. The policeman was tried and convicted of murder. The youth's family retained petitioner Elmer Gertz to represent them in civil litigation against the policeman. The defendant, in an article appearing in his magazine, American Opinion, alleged that the policeman's murder trial was part of a Communist conspiracy to discredit policemen. It falsely stated that Gertz had arranged the policeman's "frame up," implied that he had a criminal record, and labeled him a "Leninist" and "Communist-fronter." The court held that the New York Times

In an earlier California case, *Melvin* v. *Reid,* 112 Cal.App. 285, [297 P. 91], the court used almost identical reasoning as that expressed in *Briscoe* in also finding that the plaintiff had stated a cause of action for invasion of privacy. *Melvin* involved a motion picture entitled "The Red Kimono," which depicted the life of a woman who had been a prostitute and had been tried for murder and acquitted seven years earlier. The movie enacted the true story of the murder trial of plaintiff and used plaintiff's maiden name. As a result, plaintiff alleged that the film ruined her new life by revealing her past to the world; that she had given up her life as a prostitute, became rehabilitated, married, and led an exemplary life in society among friends and associates who were unaware of these incidents in her past. The court held that the use of the incidents from her life was not actionable because they appeared in public records, but that the use of her *name* in the movie was an invasion of her right of privacy.[9]

Another leading case (decided by the U.S. Circuit Court of Appeals) reached a different result from *Briscoe* and *Reid*. In *Sidis* v. *F-R Pub. Corporation* (2d Cir. 1940) 113 F.2d 806 [138 A.L.R. 15], the court held that a complaint alleging the publication of a biographical article in the New Yorker magazine without plaintiff's consent did not state a cause of action for invasion of privacy. There, the plaintiff had been a child prodigy

---

standard did not apply because Gertz was not a public figure. In the process, the court indicated that there exist two distinct classes of public figures, stating (at p. 351 [41 L.Ed.2d at p. 812]): "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions."

[9]There, the court stated: "The use of appellant's true name in connection with the incidents of her former life in the plot and advertisements was unnecessary and indelicate and a wilful and wanton disregard of that charity which should actuate us in our social intercourse and which should keep us from unnecessarily holding another up to the scorn and contempt of upright members of society.

". . . . . . . . . . . . . . .

"One of the major objectives of society as it is now constituted, and of the administration of our penal system, is the rehabilitation of the fallen and the reformation of the criminal. Under these theories of sociology it is our object to lift up and sustain the unfortunate rather than tear him down. Where a person has by his own efforts rehabilitated himself, we, as right-thinking members of society, should permit him to continue in the path of rectitude rather than throw him back into a life of shame or crime. Even the thief on the cross was permitted to repent during the hours of his final agony.

"We believe that the publication by respondents of the unsavory incidents in the past life of appellant after she had reformed, coupled with her true name, was not justified by any standard of morals or ethics known to us and was a direct invasion of her inalienable right [of privacy]."

who had lectured to eminent mathematicians at age 11 and had graduated from Harvard at age 16. Since his graduation he had sought to live as unobtrusively as possible. He effectively disappeared from public view and led an obscure life as a bookkeeper, occupying himself in collecting street-car transfers and studying the lore of Okamakammessett Indians. In its magazine, as one of a series of articles under the title "Where Are They Now?," defendant published a biographical sketch of the past and present life of plaintiff which contained a "merciless" description of the intimate details of his personal life and activities. Although the court described the article as "a ruthless exposure of a once public character who had once sought and now has been deprived of the seclusion of a private life," it reasoned that the plaintiff had remained a matter of public concern and was still newsworthy some 27 years later.

In all three cases, *Briscoe, Reid,* and *Sidis,* the plaintiffs made every effort to live in seclusion and avoid publicity. However, *Briscoe* and *Reid* can be distinguished from *Sidis* on the basis that they involved rehabilitated criminals, whereas *Sidis* dealt with a child genius who merely loathed public attention.[10]

Prior to *Briscoe,* there were several decisions which held that once a person became a matter of public interest, he could not revert to a private status merely by lapse of time. (*Carlisle* v. *Fawcett Publications, Inc.,* 201 Cal.App.2d 733, 746 [20 Cal.Rptr. 405]; *Werner* v. *Times-Mirror Co.,* 193 Cal.App.2d 111, 118 [14 Cal.Rptr. 208]; *Smith* v. *National Broadcasting Co.,* 138 Cal.App.2d 807, 814 [292 P.2d 600]; *Cohen* v. *Marx,* 94 Cal. App.2d 704, 705 [211 P.2d 320]; see also Prosser, Law of Torts, § 118, p. 826.) In *Smith* v. *National Broadcasting Co.,* the court stated: "It is a characteristic of every era . . . that events which have caught the popular imagination or incidents which have aroused the public interest, have been frequently revivified long after their occurrence in the literature, journalism, or other media of communication of a later day. These events, being embedded in the communal history, are proper material for such recounting. It is well established, therefore, that the mere passage of time does not preclude the publication of such incidents from the life of one formerly in the public eye which are already public property." However, the *Briscoe* court held that although a public personage loses his right to privacy for a certain period of time, "[i]t would be a crass legal fiction to assert that a matter once public never becomes private again. Human forgetfulness over time puts today's 'hot' news in tomorrow's dusty archives. In a nation of

---

[10]We express no opinion as to whether the present California expressions upon the rules of law herein involved are in accord with the result reached in *Sidis.*

200 million people there is ample opportunity for all but the most infamous to begin a new life." (Fn. omitted; *id.,* at pp. 539-540.) Thus it appears that the court modified these earlier decisions as far as the lapse of time issue is concerned when the individual's name is used in connection with the event. The fact that a plaintiff may have been a public personage at one time may no longer be a viable defense to this type of invasion of privacy suit. Where the plaintiff is a past criminal and his name is used in a publication, the mere lapse of time may provide a basis for an invasion of privacy suit. The length of time between the commission of the crime and its subsequent redisclosure becomes a factor in the statement of a cause of action.

 In the present case, we are not involved with either a reformed criminal, or a person who tried to avoid public scrutiny. We are dealing with a person who injected himself into the vortex of publicity by returning nearly a quarter of a million dollars. Although the family name was mentioned in the reprint, the textbook is still protected by the First Amendment because it satisfies both elements delineated by the court in *Briscoe:* "[A] truthful publication is constitutionally protected if (1) it is newsworthy and (2) it does not reveal facts so offensive as to shock the community's notions of decency" (*Id.,* at p. 541); and (3) it is not published with reckless disregard for its offensiveness. (*Id.,* at p. 543.)[11]

The criteria for determining whether an article is newsworthy was enunciated in *Kapellas* v. *Kofman, supra,* 1 Cal.3d 20, 36 as follows: "In determining whether a particular incident is 'newsworthy' and thus whether the privilege shields its truthful publication from liability, the courts consider a variety of factors, including [1] the social value of the facts published, [2] the depth of the article's intrusion into ostensibly private affairs, and [3] the extent to which the party voluntarily acceded to a position of public notoriety." In the instant case, plaintiffs have failed to allege facts showing an infringement upon any part of their private lives. (See *Briscoe, supra,* at pp. 535-536, fn. 7; *Estill* v. *Hearst Publishing Co.* (7th Cir. 1951) 186 F.2d 1017.) The crux of this form of the tort is the unwarranted publication of intimate details of one's private life which are outside the realm of legitimate public interest. (*Coverstone* v. *Davies,* 38 Cal.2d 315, 322-323 [239 P.2d 876]; Prosser, *Privacy,* 48 Cal.L.Rev. 383, 394.) Here, we are not involved with a *Briscoe* or *Reid* type of case where Johnson had been prosecuted for stealing the money. To the contrary, he returned $240,000 which he found in the middle of a city street. Indeed, his action was not only

---

[11]If a jury finds that a publication discloses private facts which are "highly offensive and injurious to the reasonable [person]" (*Briscoe, supra,* at p. 543), then it would inter alia also satisfy the reckless disregard requirement. (See fn. 12, *infra.*)

highly praised, but Johnson was given a $10,000 reward and received a letter of commendation from President Kennedy for his "unflinching honesty." ■ A person may, by his own activities or by the force of circumstances, become a public personage and thereby relinquish a part of his right of privacy to the extent that the public has a legitimate interest in his activities. (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, 351 [41 L.Ed.2d 789, 812].) A necessary corollary is that people closely related to public figures also lose their right of privacy to some extent. (*Carlisle* v. *Fawcett Publications, Inc., supra,* 201 Cal.App.2d 733, 747.)

■ Moreover, we are convinced that the article does not reveal facts "so offensive as to shock the community's notions of decency." (*Briscoe, supra,* at p. 541.)[12] It describes Johnson's act as "a strictly honest deed that should have made him the most admired of men," and states that he had acted "according to the dictates of pure and simple honesty." A reasonable person certainly would not find the article highly offensive. In a similar situation, the district court in *Samuel* v. *Curtis Pub. Co.* (N.D.Cal. 1954) 122 F.Supp 327, applying California law, held that a magazine publisher was not liable for republishing a photograph taken of the plaintiff attempting to dissuade a woman hanging on a bridge from committing suicide. The photograph had first appeared in a newspaper on April 22, 1952, and was republished in the February 6, 1954, issue of the Saturday Evening Post in connection with an article on suicides. The court pointed out that the photograph was merely illustrative of various types of suicides and that nothing in the article referred specifically to the photograph. The court observed (at pp. 328-329): "An invasion of the right of privacy occurs not with the mere publication of a photograph, but occurs when a photograph is published where the publisher should have known that its publication would offend the sensibilities of a normal person, and whether there has been such an offensive invasion of privacy is to some extent a question of law, . . . Gill v. Hearst Pub. Co., 1953, 40 Cal.2d 224, 253 P.2d 441. Where the photograph portrays nothing to shock the ordinary sense of decency or propriety, where there is nothing uncomplimentary or discreditable in the photograph itself, and where the caption and article add nothing that makes the photograph uncomplimentary or discreditable no actionable invasion of the right of privacy occurs, Gill v. Hearst Pub. Co., supra.

---

[12]The *Briscoe* court noted (at p. 543, fn. 18): "A publisher does have every reason to know, *before* publication that identification of a man as a former criminal will be highly offensive to the individual involved." On the other hand, the court indicated that *Briscoe* must be contrasted with *Time, Inc.,* v. *Hill,* 385 U.S. 374 [17 L.Ed.2d 456, 87 S.Ct. 534], stating (at p. 542, fn. 17) "most people would not consider their momentary status as a hostage of escaped criminals to be so offensive or discreditable as to render the disclosure of this fact outrageous."

". . . . [Plaintiff] is not presented in a derogatory pose, nor is there anything to represent that his conduct is in any way reprehensible. Indeed, it was most laudatory. The Court finds that no reasonable person could find anything in the appearance or conduct of [plaintiff] which would cause the publisher of the picture to have reason to believe that the picture would offend the sensibilities of a normal person." Here, we are confronted with a fact pattern which exemplifies honesty. In *Samuel,* compassion and citizen participation to prevent disaster were the purport of the subject matter. In either instance, the subject matter continued on over the years as one of public attention, and continued in its newsworthiness. Johnson's name became an indispensable part of the total theme of honesty. Just as the fable is an educational tool, so likewise is a true life example of integrity one which justifies repetitive recounting. This was the text's purpose, as well as others more directly related to the literary field, such as style and clarity, development of topic matter, and the like.

In the instant case, two of the questions following the article asked the students, "Why would anyone consider Johnson a fool for returning [the money]?" "Do you?" We must examine these questions in the context in which they were asked. We do not believe that these questions were asked with the intent of demeaning Johnson. They were only intended as a classroom tool to encourage discussion of the alternatives of persons faced with what could well constitute temptation away from honesty. We recognize, however, that the questions might be tortuously interpreted by persons to imply criticism of Johnson, suggesting that he was a fool, "so that [their] publication might be objectionable as going 'beyond the limits of decency' and reasonably indicate defendants' conduct to be such that they 'should have realized [they] would be [highly] offensive to persons of ordinary sensibilities.' [Citation.]" (*Gill* v. *Hearst Publishing Co., supra,* at pp. 230-231.) Were we to conclude that this is a rational construction, which we do not, there would then be presented a cause of action for tortious invasion of privacy.

b. *False Light in the Public Eye:*

■ As previously noted, in *Kapellas* v. *Kofman, supra,* 1 Cal.3d 20 (and reiterated in *Briscoe, supra,* at p. 543), the Supreme Court held that a false light action is in substance equivalent to a defamation suit. A plaintiff alleging false light, therefore, must also satisfy the requirements of malice (*Time, Inc.* v. *Hill, supra,* 385 U.S. 374; *St. Amant* v. *Thompson,* 390 U.S. 727, at p. 731 [20 L.Ed.2d 262, at p. 267, 88 S.Ct. 1323]) and demand for retraction within 20 days of notice of the publication. (Civ. Code,

§ 48a.)[13] Plaintiffs here alleged malice, but did not comply with Civil Code section 48a. Although *Briscoe* extended the coverage of section 48a to encompass magazines, under the conclusion we here reach we do not determine whether the retraction requirement extends to the publication of books. No cause of action for false light in the public eye could here be alleged.

### c. *Appropriation of Name or Likeness for Commercial Purposes:*

■ This category of invasion of privacy was codified in California in 1971. Civil Code section 3344, subdivision (a), provides as follows: "(a) Any person who knowingly uses another's name, photograph, or likeness, in any manner, for purposes of advertising products, merchandise, goods

---

[13]Civil Code section 48a provides: "1. In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous.

"2. If a correction be demanded within said period and be not published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as were the statements claimed to be libelous, in a regular issue thereof published or broadcast within three weeks after such service, plaintiff, if he pleads and proves such notice, demand and failure to correct, and if his cause of action be maintained, may recover general, special and exemplary damages; provided that no exemplary damages may be recovered unless the plaintiff shall prove that defendant made the publication or broadcast with actual malice and then only in the discretion of the court or jury, and actual malice shall not be inferred or presumed from the publication or broadcast.

"3. A correction published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as the statements claimed in the complaint to be libelous, prior to receipt of a demand therefor, shall be of the same force and effect as though such correction had been published or broadcast within three weeks after a demand therefor.

"4. As used herein, the terms 'general damages,' 'special damages,' 'exemplary damages' and 'actual malice,' are defined as follows:

(a) 'General damages' are damages for loss of reputation, shame, mortification and hurt feelings;

(b) 'Special damages' are all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other;

(c) 'Exemplary damages' are damages which may in the discretion of the court or jury be recovered in addition to general and special damages for the sake of example and by way of punishing a defendant who has made the publication or broadcast with actual malice;

(d) 'Actual malice' is that state of mind arising from hatred or ill will toward the plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broadcast at the time it is published or broadcast shall not constitute actual malice."

or services, or for purposes of solicitation of purchases of products . . . without such person's prior consent . . . shall be liable for any damages sustained by the person . . . injured as a result thereof." We are convinced that the article was not so "directly" connected with the sale of the textbook that it falls within the purview of section 3344, subdivision (a). The article must be viewed in the context in which it was republished. It was only used as an educational tool in an English textbook. It is obvious that the article was not a primary reason for the textbook; nor was it a substantial factor in the students' purchases of the book. (See *Klein* v. *McGraw-Hill, Inc.* (D.D.C. 1966) 263 F.Supp. 919; *Corabi* v. *Curtis Publishing Co.* (1971) 441 Pa. 432 [273 A.2d 899]; *Dallesandro* v. *Henry Holt & Co.* (1957) 4 App.Div.2d 470 [166 N.Y.S.2d 805]; *Kline* v. *Robert M. McBride & Co.* (1939) 170 Misc. 974 [11 N.Y.S.2d 674].) This fact pattern is clearly distinguishable from the other California cases which have granted recovery for appropriation. (See *Stilson* v. *Reader's Digest Assn., Inc.,* 28 Cal.App.3d 270 [104 Cal.Rptr. 581]; *Williams* v. *Weisser,* 273 Cal.App.2d 726 [78 Cal.Rptr. 542, 38 A.L.R.3d 761]; *Fairfield* v. *American Photocopy etc. Co., supra,* 138 Cal.App.2d 82.)

Plaintiffs also assert that even if they failed to state a cause of action for invasion of privacy the demurrer must be overruled because they have stated a cause of action for violation of Civil Code section 3523, which provides: "For every wrong there is a remedy." This is an illusory contention. Section 3523 does not create a separate basis of recovery, absent a showing of fact otherwise sufficient to constitute a legal wrong. (2 Witkin, Cal. Procedure (2d ed.) § 5, p. 882.) A cause of action in tort is based on a violation of a legally protected right. The facts alleged in the first cause of action simply do not show that defendants have inflicted any legally cognizable wrong on plaintiffs.

### d. *Statute of Limitations:*

Even assuming that plaintiffs had stated a cause of action for tortious invasion of privacy, their cause of action would be barred by the statute of limitations. Plaintiffs' complaint in this action was not filed until December 29, 1972, more than seven years after the publication of the textbook.[14] The applicable statute of limitations for tortious invasion of

---

[14]California has adopted the Uniform Single Publication Act, Civil Code section 3425.3, which provides: "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication . . . such as any one issue of a . . . book . . . ." Therefore, the cause of action for invasion of privacy accrued upon the initial distribution of

privacy is found in Code of Civil Procedure section 340, subdivision 3, which sets forth a one-year period during which the action may be filed. (*Belli* v. *Roberts Brothers Furs,* 240 Cal.App.2d 284 [49 Cal.Rptr. 625].) Plaintiffs, however, assert that the statute should be tolled and begin to run on the date they first were told of the publication, because defendants fraudulently concealed the publication from them.

It is the general rule that the statute of limitations will begin to run regardless of whether a plaintiff is aware that he has a cause of action (2 Witkin, Cal. Procedure (2d ed.) § 264, p. 1117.) However, there are exceptions to this rule which provide that the statute will be tolled and begin to run from the time the aggrieved party discovers the underlying facts giving rise to the cause of action. One of these exceptions is found in Code of Civil Procedure section 338, subdivision 4, which provides relief on the ground of fraud or mistake. Another exception which is based primarily on equitable considerations provides relief when the facts giving rise to the cause of action are fraudulently concealed from the aggrieved party. (*Pashley* v. *Pacific Elec. Ry. Co.,* 25 Cal.2d 226 [153 P.2d 325]; 2 Witkin, Cal. Procedure (2d ed.) § 401, p. 1235.) It is this latter exception upon which plaintiff relies.

Plaintiffs have not alleged that defendants made any affirmative statement or did any act to prevent plaintiffs from learning of the existence of the English textbook. Rather, plaintiffs argue that the failure of defendants to notify them of the publication constitutes constructive fraud (Civ. Code, § 1573).

It is well established that mere nondisclosure of the existence of a cause of action does not constitute fraudulent concealment in the absence of a fiduciary or confidential relationship. (*Hesse* v. *Vinatieri,* 145 Cal.App.2d 448, 451 [302 P.2d 699]; see Annot. 45 A.L.R.3d 630.) in the present case, it is clear that no such relationship existed; nor were defendants under a duty to inform plaintiffs that they were republishing the magazine article. To hold otherwise would impose too great a burden on a defendant and chill the freedoms guaranteed by the First Amendment. The textbook was used in college English courses (apparently, throughout the country), and the mere fact that plaintiffs were unaware of its publication does not provide the necessary ingredient for fraudulent concealment.

---

the textbook. (*Belli* v. *Roberts Brothers Furs, supra,* at p. 289.) However, it should be pointed out that if defendants reprint the textbook they may cause the statute of limitations to start running again from the date of reprinting. (See Annot. 42 A.L.R.3d 807, 828-829.) Since there is no evidence to indicate that the textbook was reprinted, we need not reach this issue.

*Second Cause of Action:*

Plaintiffs assert that this cause of action sounds in tort and is based on a violation of a statutory obligation owed to them by defendants pursuant to Civil Code sections 1708 and 1714.[15] We do not agree for the same reasons hereinbefore set forth relating to plaintiffs' first cause of action based on an alleged violation of section 3523. In order to constitute an actionable tort, there must be a legal duty owed by a defendant to the one injured, for, in the absence of such a duty, any damage caused is injury without wrong. (*Wilson* v. *Union Iron Works Drydock Co.,* 167 Cal. 539 [140 P. 250].) Under the facts of this case, defendants owed no legal duty to plaintiffs.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied January 6, 1975, and appellants' petition for a hearing by the Supreme Court was denied February 19, 1975.

---

[15]Civil Code section 1708: "Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights."

Civil Code section 1714: "Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself. The extent of liability in such cases is defined by the title on compensatory relief."