[Civ. No. 66447. Second Dist., Div. Two. July 18, 1983.]

CAROL BURNETT, Plaintiff and Respondent, v.
NATIONAL ENQUIRER, INC., Defendant and Appellant.

## COUNSEL

Williams & Connolly, John G. Kester, Harold Ungar, Selvin & Weiner and Paul P. Selvin for Defendant and Appellant.

Jack C. Landau, Judy D. Lynch, Robert S. Becker, Pierson, Ball & Dowd and J. Laurent Scharff as Amici Curiae on behalf of Defendant and Appellant.

Barry B. Langberg, Stephen S. Monroe, Paul S. Ablon, Richard P. Towne and Hayes & Hume for Plaintiff and Respondent.

## OPINION

**ROTH, P. J.**—On March 2, 1976, appellant caused to appear in its weekly publication, the National Enquirer, a "gossip column" headlined "Carol

Burnett and Henry K. in Row," wherein a four-sentence item specified in its entirety that: "In a Washington restaurant, a boisterous Carol Burnett had a loud argument with another diner, Henry Kissinger. Then she traipsed around the place offering everyone a bite of her dessert. But Carol really raised eyebrows when she accidentally knocked a glass of wine over one diner and started giggling instead of apologizing. The guy wasn't amused and 'accidentally' spilled a glass of water over Carol's dress."

Maintaining the item was entirely false and libelous,[1] an attorney for Ms. Burnett, by telegram the same day and by letter one week later, demanded its correction or retraction "within the time and in the manner provided for in Section 48(a) of the Civil Code of the State of California," failing which suit would be brought by his client [respondent herein], a well known actress, comedienne and show-business personality.

In response to the demand, appellant on April 6, 1976, published the following retraction, again in the National Enquirer's gossip column: "An item in this column on March 2 erroneously reported that Carol Burnett had an argument with Henry Kissinger at a Washington restaurant and became boisterous, disturbing other guests. We understand these events did not occur and we are sorry for any embarrassment our report may have caused Miss Burnett."

On April 8, 1976, respondent, dissatisfied with this effort in mitigation, filed her complaint for libel in the Los Angeles Superior Court. Trial before a jury resulted in an award to respondent of $300,000 compensatory damages and $1.3 million punitive damages. The trial court by remittitur thereafter rendered its judgment in respondent's favor for $50,000 compensatory and $750,000 punitive damages. This appeal followed.

As formulated by appellant, apart from two claimed irregularities occurring upon the trial, the principal issues here are whether the National Enquirer is excluded from the protection afforded by Civil Code section 48a,[2]

---

[1] "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.)

[2] Section 48a provides:

"1. In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous.

"2. If a correction be demanded within said period and be not published or broadcast in

and whether the damage award and penalty specified in the judgment can stand.

Prior to addressing the merits of appellant's contentions and in aid of our disposition, we set out the following further facts pertaining to the publication complained of and descriptive of the nature and character of the National Enquirer, which were adequately established in the proceedings below.

On the occasion giving rise to the gossip column item hereinabove quoted, respondent, her husband and three friends were having dinner at the Rive Gauche restaurant in the Georgetown section of Washington, D.C. The date was January 29, 1976. Respondent was in the area as a result of being invited to be a performing guest at the White House. In the course of the dinner, respondent had two or three glasses of wine. She was not inebriated. She engaged in banter with a young couple seated at a table next to hers, who had just become engaged or were otherwise celebrating. When curiosity was expressed about respondent's dessert, apparently a chocolate souffle, respondent saw to it the couple were provided with small amounts of it on plates they had passed to her table for the purpose. Perhaps from having witnessed the gesture, a family behind respondent then offered to exchange some of their baked alaska for a portion of the souffle, and they, too, were

---

substantially as conspicuous a manner in said newspaper or on said broadcasting station as were the statements claimed to be libelous, in a regular issue thereof published or broadcast within three weeks after such service, plaintiff, if he pleads and proves such notice, demand and failure to correct, and if his cause of action be maintained, may recover general, special and exemplary damages; provided that no exemplary damages may be recovered unless the plaintiff shall prove that defendant made the publication or broadcast with actual malice and then only in the discretion of the court or jury, and actual malice shall not be inferred or presumed from the publication or broadcast.

"3. A correction published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as the statements claimed in the complaint to be libelous, prior to receipt of a demand therefor, shall be of the same force and effect as though such correction had been published or broadcast within three weeks after a demand therefor.

"4. As used herein, the terms 'general damages,' 'special damages,' 'exemplary damages' and 'actual malice,' are defined as follows:

"(a) 'General damages' are damages for loss of reputation, shame, mortification and hurt feelings;

"(b) 'Special damages' are all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he had expended as a result of the alleged libel, and no other;

"(c) 'Exemplary damages' are damages which may in the discretion of the court or jury be recovered in addition to general and special damages for the sake of example and by way of punishing a defendant who has made the publication or broadcast with actual malice;

"(d) 'Actual malice' is that state of mind arising from hatred or ill will toward the plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broadcast at the time it is published or broadcast shall not constitute actual malice."

similarly accommodated. As respondent was later leaving the restaurant, she was introduced by a friend to Henry Kissinger, who was dining at another table, and after a brief conversation, respondent left with her party.

There was no "row" with Mr. Kissinger, nor any argument between the two, and what conversation they had was not loud or boisterous. Respondent never "traipsed around the place offering everyone a bite of her dessert," nor was she otherwise boisterous, nor did she spill wine on anyone, nor did anyone spill water on her and there was no factual basis for the comment she ". . . started giggling instead of apologizing."

The impetus for what was printed about the dinner was provided to the writer of the item, Brian Walker, by Couri Hays, a freelance tipster paid by the National Enquirer on an ad hoc basis for information supplied by him which was ultimately published by it, who advised Walker he had been informed respondent had taken her Grand Marnier souffle around the restaurant in a boisterous or flamboyant manner and given bites of it to various other people; that he had further but unverified information respondent had been involved in the wine-water spilling incident; but that, according to his sources, respondent was "specifically, emphatically" not drunk. No mention was made by Hays of anything involving respondent and Henry Kissinger.

Having received this report, Walker spoke with Steve Tinney, whose name appears at the top of the National Enquirer gossip column, expressing doubts whether Hays could be trusted. Tinney voiced his accord with those doubts. Walker then asked Gregory Lyon, a National Enquirer reporter, to verify what Walker had been told by Hays. Lyon's inquiry resulted only in his verifiying respondent had shared dessert with other patrons and that she and Kissinger had carried on a good natured conversation at the restaurant.

In spite of the fact no one had told him respondent and Henry Kissinger had engaged in an argument, that the wine-water spilling story remained as totally unverified hearsay, that the dessert sharing incident was only partially bolstered, and that respondent was not under any view of the question inebriated, Walker composed the quoted item and approved the "row" headline.

The National Enquirer is a publication whose masthead claims the "Largest Circulation Of Any Paper in America." It is a member of the American Newspaper Publishers Association. It subscribes to the Reuters News Service. Its staff call themselves newspaper reporters. It describes its business as "newspaper" in its filings with the Los Angeles County Assessor and in its applications for insurance. A state revenue department has ruled it qual-

ifies as a newspaper and is thus exempt from sales and use tax. The United States Department of Labor describes it as 'belonging to establishments primarily engaged in publishing or printing and publishing newspapers.''

By the same token the National Enquirer is designated as a magazine or periodical in eight mass media directories and upon the request and written representation of its general manager in 1960 that "In view of the feature content and general appearance [of the publication], which differ markedly from those of a newspaper . . .," its classification as a newspaper was changed to that of magazine by the Audit Bureau of Circulation. It does not subscribe to the Associated Press or United Press International news services. According to a statement by its senior editor it is not a newspaper and its content is based on a consistent formula of "how to" stories, celebrity or medical or personal improvement stories, gossip items and TV column items, together with material from certain other subjects. It provides little or no current coverage of subjects such as politics, sports or crime, does not attribute content to wire services, and in general does not make reference to time. Normal "lead time"[3] for its subject matter is one to three weeks. Its owner allowed it did not generate stories "day to day as a daily newspaper does."

*Did the trial court err in holding the National Enquirer was not a newspaper within the provisions of Civil Code section 48a? No.*

■ At appellant's request, the trial court herein made its determination[4] after hearing and based on extensive evidence that the National Enquirer

---

[3] If a "deadline" is the time by which an article must be placed in the printing process in order to be completed for distribution, by one accepted definition "lead time" is the period from the deadline to such point of completion, or, put another way, is the shortest period of time between completion of an article and the time it is published.

[4] The determination referred to is that ultimately made immediately prior to trial. Earlier, in January of 1980, appellant moved for partial summary judgment on the ground the "hatred or ill will" required to be shown under section 48a (see fn. 2) could not be established by respondent, thereby precluding punitive damages. That motion was granted. In February 1980, respondent moved to modify or vacate the order. After consideration of this motion, the prior order was modified to state that a triable issue of fact existed whether "hatred or ill will" could be shown but that as a matter of law the National Enquirer was a newspaper "within the meaning of newspaper as said term is contained in Civil Code § 48(a)."

Within six months following the modification, respondent moved to vacate both prior rulings and this motion was granted upon the premise "the issue of whether or not defendant National Enquirer is a newspaper or magazine for purposes of Civil Code § 48(a) and this action is a triable issue of fact which shall be determined upon trial."

While appellant now suggests the "newspaper" issue should at least have been submitted to the jury, its trial brief on the point specifically concluded that "The question of the newspaper or magazine status of The National Enquirer under Civil Code § 48(a) is one for the Court. *Montandon* v. *Triangle Publications, Inc.,* 45 Cal.App.3d 938, 953 (1975)."

·was not a newspaper for purposes of the application of Civil Code section 48a (see fn. 2).

In so concluding, while it took into account the indicia relating to status detailed above, it relied upon the most fundamental of those considerations which have been deemed sufficient to justify the designation of that particular class as the beneficiary of the protection afforded by the statute, namely, that newspapers by virtue of the manner in which they are obliged to operate are not generally in a position adequately to guard against the publication of material which is untrue, such that: "In view of the complex and far-flung activities of the news services upon which newspapers and radio stations must largely rely and the necessity of publishing news while it is new, newspapers and radio stations may in good faith publicize items that are untrue but whose falsity they have neither the time nor the opportunity to ascertain." (*Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 128 [216 P.2d 825, 13 A.L.R.2d 252].)

The preferred status thus being seen as hinging on the inability of newspapers to verify information while optimally disseminating news, the trial court focused on the element of time as that element was related to appellant's publication process or business mode and found crucial to its determination the National Enquirer should not be characterized as a newspaper evidence showing the reason for that preferred status to be lacking.

Appellant contends the rationale so employed by the trial court was erroneous and in support of the claim maintains that the special classification approved in *Werner* v. *Southern Cal. etc. Newspapers, supra,* 35 Cal.2d 121, depended on the public's interest in the "free dissemination of news," without reference to questions of timeliness; that the cases of *Pridonoff* v. *Balokovich* (1951) 36 Cal.2d 788 [228 P.2d 6] (§ 48a to be applied in favor of all participants—e.g., columnists, critics, editors—in newspaper publications), *Maidman* v. *Jewish Publications, Inc.* (1960) 54 Cal.2d 643 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439] (§ 48a applicable to weekly newspaper), *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20 [81 Cal.Rptr. 360, 459 P.2d 912] (§ 48a applicable to editorial) and *Field Research Corp.* v. *Superior Court* (1969) 71 Cal.2d 110, 114, footnote 4 [77 Cal.Rptr. 243, 453 P.2d 747] (language in footnote implying § 48a applies to "publishing . . . enterprises") constitute an unbroken line of authority consistent with appellant's position; and that *Briscoe* v. *Reader's Digest Assn.* (1971) 4 Cal.3d 529 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1] (§ 48a applicable to the named defendant) "clearly [holding] § 48a applicable to a magazine—indeed to a monthly magazine that published digests of other magazine articles, rather than current happenings," requires a like result with respect to the National Enquirer. Further support for the conclusion, it is said,

derives from language appearing in *Johnson* v. *Harcourt, Brace, Jovanovich, Inc.* (1974) 43 Cal.App.3d 880, 894 [118 Cal.Rptr. 370], and *Harris* v. *Curtis Publishing Co.* (1942) 49 Cal.App.2d 340, 353-354 [121 P.2d 761].

An understanding of the pertinent authorities differing from that so proffered by appellant, however, appears in *Morris* v. *National Federation of the Blind* (1961) 192 Cal.App.2d 162 [13 Cal.Rptr. 336] and in *Montandon* v. *Triangle Publications, Inc.* (1975) 45 Cal.App.3d 938 [120 Cal.Rptr. 186, 84 A.L.R.3d 1234], (hg. den. May 8, 1975). In *Morris,* the court examined the issue in terms of a newspaper-magazine dichotomy, and observed that: "[T]he statute [§ 48a] on its face applies only to publication 'in a newspaper, or . . . by radio broadcast.' No California decision has specifically determined whether this provision applies also to magazines. However, our Supreme Court, in holding the statute constitutional, has noted the interest of the public in the free dissemination of news (*Werner* v. *Southern Calif. etc. Newspapers,* 35 Cal.2d 121, 128 . . .). Particular emphasis was placed upon the pressures upon media of news dissemination for publishing 'news while it is new,' and the resultant limitation of time and opportunity for ascertaining the complete accuracy of all items printed. Both dissenting opinions (pp. 138, 153) asserted arbitrary and discriminatory classification in the omission of magazines from the protected group. Law review comment has assumed the exclusion of magazines from protection (64 Harv. L.Rev., 678, 679).

"Although one decision (*Harris* v. *Curtis Publishing Co.,* 49 Cal.App.2d 340, 353-354 . . .) has assumed application of section 48a to magazines, it does not discuss the point, which apparently was not raised by the briefs. Another (*Shumate* v. *Johnson Publishing Co.,* 139 Cal.App.2d 121, 129-130 . . .) implies that the statute does not extend to magazines . . . .

". . . . . . . . . . . . . . . . . . . .

"On full review of the statute, we conclude that it applies only to a publication in a newspaper or by radio. Its terms are clear. The legislature conspicuously failed to include magazines in the protected group. We are bound by this apparently intended omission. Extension of the statute requires amendment rather than interpretation." (*Morris* v. *National Federation of the Blind, supra,* 192 Cal.App.2d 162, 165-166.)

Employing a similar analysis, the court in *Montandon* agreed with the conclusion reached in *Morris.* In doing so, however, it was further obliged to confront the intervening and apparently contrary holding in *Briscoe* v.

*Readers Digest Association, Inc., supra,* 4 Cal.3d 529, which it rationalized as follows:

"In *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529 . . ., an action against the publisher of Reader's Digest for invasion of plaintiff's right of privacy by publishing the fact that some 11 years prior to the publication he had hijacked a truck and fought a gun battle with police, the trial court sustained without leave to amend a demurrer to the complaint. The Supreme Court reversed, holding that the complaint did state a cause of action for invasion of privacy by publication of plaintiff's name in the article. The court stated further that allegations in the complaint were not sufficient to state a 'false light' cause of action, one which is in substance equivalent to a libel claim, because the plaintiff had not complied with the requirements of section 48a.

"As *Briscoe* involved not a newspaper but a magazine, it would appear that the court was holding that section 48a applies to a magazine as well as a newspaper. Unfortunately, no discussion appears therein of the cases which hold that the section does not apply to magazines. Nor is there any discussion of the reasons upon which the holding is based. . . . Moreover, the court in *Briscoe* cited as the only support for its holding, *Werner, supra,* and *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20 . . ., both of which were libel actions against newspapers and contained no discussion of the application of section 48a to magazines.

"Section 48a was originally adopted in 1931 (Stats. 1931, ch. 1018, § 1, p. 2034) and applied only to newspapers. It was amended in 1945 (Stats. 1945, ch. 1489, § 5, p. 2763) to add radio. The statute on its face applied only to ' "a newspaper" and radio broadcast.' It is significant in light of the decision in *Morris, supra,* in 1961 that the section did not apply to magazines, that the Legislature has not amended it to include magazines. It is also significant that the Legislature in 1949 provided in section 48.5 of the Civil Code that the term 'radio broadcast' as used in part 2 of the code is 'defined to include both visual and sound radio broadcasting.' If, as defendant claims, the Legislature intended to include magazines it has had abundant opportunity to do so.

"In *Briscoe, supra,* page 543, the court said: '. . . *We hold today only that, as pleaded, plaintiff has stated a valid cause of action, sustaining the demurrer to plaintiff's complaint was improper, and that the ensuing judgment must therefore be reversed.*' [Italics added.] In view of the court's statement limiting its opinion to a matter of pleading and the other matters above stated, *Briscoe* cannot be considered as authority for overruling the determination in *Morris, supra,* page 162, that section 48a does not apply

to magazines.''[5] (*Montandon* v. *Triangle Publications, Inc., supra,* 45 Cal.App.3d 938, 951-952 (hg. den. May 8, 1975); see also *Alioto* v. *Cowles Communications, Inc.* (9th Cir. 1975) 519 F.2d 777, cert. den. 423 U.S. 930 [46 L.Ed.2d 259, 96 S.Ct. 280]; *Cameron* v. *Wernick* (1967) 251 Cal.App.2d 890, 892, fn. 1 [60 Cal.Rptr. 102].)

From the foregoing it would appear no definitive exposition of the scope of section 48a has been articulated sufficiently for us to say the question of its application here is without doubt. We nevertheless are of the opinion that what emerges as the better view from the authorities discussed is the proposition that the protection afforded by the statute is limited ''to those who engage in the immediate dissemination of news on the ground that the Legislature could reasonably conclude that such enterprises . . . cannot always check their sources for accuracy and their stories for inadvertent publication errors . . . .'' (*Field Research Corp.* v. *Superior Court, supra,* 71 Cal.2d 110, 114.)

Seen in this light, the essential question is not then whether any publication is properly denominated a magazine or by some other designation, but simply whether it ought to be characterized as a newspaper or not within the contemplation of section 48a, a question which must be answered, as the trial court supposed, in terms which justify an expanded barrier against damages for libel in those instances, and those only, where the constraints of time as a function of the requirements associated with production of the publication dictate the result.[6]

---

[5]The *Montandon* court further observed that: ''*Johnson* v. *Harcourt, Brace, Jovanovich, Inc.* (1974) 43 Cal.App.3d 880 . . ., is an action for invasion of the plaintiff's right of privacy by republication of an article from The Nation magazine in a college English textbook. Judgment of the trial court sustaining the defendant's demurrer without leave to amend was affirmed. In the opinion reference is made to *Kapellas, supra,* page 20, and in *Briscoe, supra,* page 529, to the California Supreme Court's determination that a false light action is in substance equivalent to a defamation suit and that a plaintiff alleging false light, therefore, must also satisfy the requirements of malice and demand for retraction within 20 days of notice of the publication[.] [C]iting Civil Code section 48a the court stated: 'Although *Briscoe* extended the coverage of section 48a to encompass magazines, under the conclusion we here reach we do not determine whether the retraction requirement extends to the publication of books.' (*Johnson, supra,* p. 894.)

''As we have pointed out hereinbefore, we do not consider *Briscoe* as authority for the proposition that section 48a applies to magazines, nor do we consider that the mere reference in *Johnson, supra,* p. 880, to section 48a adds anything to the issue, particularly as the court refused to go into the application of section 48a to books and the question of its application to magazines was not before the court.'' (*Montandon* v. *Triangle Publications, Inc., supra,* 45 Cal.App.3d 938, 952-953.)

[6]In so saying we are mindful of the semantic and substantive difficulties inherent in the use in the present context of such words as ''immediate'' (''timely'') and ''news,'' it being the case that the former might be seen as a function of occurrence, or of discovery, or something else and the latter may be regarded as the product of the media, or as dependent for its definition upon the perception of its recipient or delineated in some other fashion.

Having so decided, we are also satisfied to conclude without extensive recitation of the evidence that the trial court consistently with the foregoing rationale correctly determined the National Enquirer should not be deemed a newspaper for the purposes of the instant litigation.

*Was there error associated with the award to respondent of $750,000 in punitive damages? Yes.*

In order, first, to provide the framework employed by us in rejecting certain contentions raised by appellant under this heading, we set out preliminarily the following considerations and principles fundamental to our conclusions.

Nearly 20 years ago, it was announced in *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 at pages 279-280 [11 L.Ed.2d 686 at page 706, 84 S.Ct. 710, 95 A.L.R.2d 1412] that: "The constitutional guarantees [relating to protected speech] require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

The constitutional privilege thus defined was extended three years later in *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975], to include within its protection not only public officials but also "public figures," such that: "Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 342 [41 L.Ed.2d 789, 807, 94 S.Ct. 2997].)

■ What was intended to be accomplished in each of these instances was to make available an "antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander" (*ibid.*), which rule holds publishers responsible for their false utterances even where an absence of "malice" is positively established, as for example in the case

(See generally, *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 346 [41 L.Ed.2d 789, 809, 94 S.Ct. 2997]; *Winters* v. *New York* (1948) 333 U.S. 507, 510 [92 L.Ed. 840, 847, 68 S.Ct. 665]; *Hannegan* v. *Esquire, Inc.* (1946) 327 U.S. 146, 158 [90 L.Ed. 586, 593, 66 S.Ct. 456]; *Goldman* v. *Time, Inc.* (N.D.Cal. 1971) 336 F.Supp. 133, 138.)

of a defamation which mistakenly or negligently identifies a party as its subject, "intending" another. (See *Taylor* v. *Hearst* (1895) 107 Cal. 262 [40 P. 392].)

Finally, in *Gertz* v. *Welch, supra,* 418 U.S. 323, because it was thought "the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a *private individual,*" (*id.,* at pp. 345-346 [41 L.Ed.2d at p. 809]; italics added) a wholesale extension of the *New York Times* test to such persons was rejected as one which would abridge that legitimate state interest to an unacceptable degree, and it was held instead that: ". . . so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual," but that: ". . . the States may not permit recovery of presumed [*i.e.,* compensatory damages without evidence of actual loss] or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." so that: ". . . In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by *New York Times* may recover only such damages as are sufficient to compensate him for actual injury." (Id., at pp. 347, 349, 350 [41 L.Ed.2d at pp. 809, 810, 811]; see also *Rosenbloom* v. *Metromedia* (1971) 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811].)

These aspects of the scope of the *New York Times* rule having been related, we observe additionally that, as will hereinafter be seen, the reference in the rule to "actual malice" may prove confusing when juxtaposed to similar terms commonly employed in the law relating to libel,[7] where, as in a case like the one before us, those terms are involved with the question of punitive damages. ■ The difference, nevertheless, between the concept of malice as the term is used respecting *liability* for libel and the meaning of the word as it provides the basis for recovery of punitive *damages* for that tort, at least in California, has been clearly articulated in the case of *Davis* v. *Hearst* (1911) 160 Cal. 143 [116 P. 530]. Thus it was there pointed out that for purposes of the distinction it is necessary only to define

---

[7]So, it has been remarked that: " 'The jumble in some modern text books on slander and libel concerning malice, actual malice, malice in law, malice in fact, implied malice, and express malice (all derived from judicial utterances, it is true) is a striking testimony of the limitations of the human mind.' (*Ullrich* v. *New York Press Co.,* 23 Misc. 168, 171, . . .)" quoted in *Davis* v. *Hearst* (1911) 160 Cal. 143 155 [116 P. 530].)

In the recent case of *Smith* v. *Wade* (1983) — U.S. —, at page —, footnote 6 [75 L.Ed.2d 632 at page 640, 103 S.Ct. 1625], a matter involving punitive damages under 42 United States Code section 1983, the majority declined to use the term "actual malice," observing that "While the term may be an appropriate one, we prefer not to use it, simply to avoid the confusion and ambiguity that surrounds the word 'malice'."

two of the several terms (see fn. 7), namely malice in law and malice in fact, the former being understood as: ". . . that malice which the law presumes (either conclusively or disputably) to exist upon the production of certain designated evidence, which malice may be fictional and constructive merely, and which, arising, as it usually does, from what is conceived to be the necessity of proof following a pleading, which in turn follows a definition, is to be always distinguished from true malice or malice in fact." and the latter referring to: ". . . a state of mind arising from hatred or ill-will, evidencing a willingness to vex, annoy, or injure another person," *or* to: "the motive and willingness to vex, harass, annoy, or injure," that is to say to: "*malus animus*—indicating that the party was actuated either by spite or ill will towards an individual, or by indirect or improper motives, though these may be wholly unconnected with any uncharitable feeling towards anybody." (*Id.*, at pp. 160, 162, 164.)

As illustrative of the respective functions of these terms in a libel case and in amplification of what is meant by malice in fact, the *Davis* court went on to point out that:

"It has been said that malice is not a necessary ingredient, is no part of the gist of our civil action for [libel]. No particular harm can be worked by the declaration that malice is a necessary part of every action for libel, if it be understood that the particular malice there referred to is the constructive or fictional malice which we have designated malice in law. There is, however, a general provision of the law allowing punitive damages in the discretion of the jury, in an action not arising from contract—in other words, in any action sounding in tort, 'where the defendant has been guilty of . . . malice, express or implied.' (Civ. Code, sec. 3294.) Enough has been said to show what a fertile field for error is the language just quoted, when attempt is made to apply it to malice, express or implied, under all their varying definitions. . . . It should be apparent that the malice, and the only malice, contemplated by section 3294 is malice in fact, and that the phrase 'express or implied' has reference only to the evidence by which that malice is established; . . .

". . . And while in the cases this malice, the existence of which we have declared to be essential to a recovery in punitive damages, is sometimes called express malice, sometimes actual malice, sometimes real malice, and sometimes true malice, it is always in its analysis malice of the one kind, *the malice of evil motive.* (*Witcher* v. *Jones,* 17 N. Y. Supp. 491; *Union Mutual Life Ins. Co.* v. *Thomas,* 83 Fed. 803, . . .; *Miner* v. *Bradstreet Co.,* 170 Mo. 486, . . .; *French* v. *Deane,* 19 Colo. 504, . . .; *Inman* v. *Ball,* 65 Iowa, 543, . . .; *Miller* v. *Kirby,* 74 Ill. 242; . . . . While such malice in fact is essential to an award of exemplary damages, it may be

proved directly or indirectly, that is to say by direct evidence of the evil motive and intent, or by legitimate inferences to be drawn from other facts and circumstances in evidence. . . ." (*Id.,* at pp. 161, 162, 163.) (Italics added.)

■ The matter herein was tried upon the premise respondent is a "public figure" and there was employed in establishing the liability of appellant the *New York Times* standard, expressed in the trial court's instruction to the jury that: "In addition, plaintiff must prove by clear and convincing evidence that defendant published the item complained of with actual malice—that is, that the defendant published the item either knowing that it was false or with reckless disregard for whether it was true or false."

On the question of punitive damages, however, the jury was instructed that such damages could be imposed if appellant had been shown "by a preponderance of the evidence" to have been "guilty of malice," which was defined as: "conduct which is intended by the defendant to cause injury to the plaintiff or carried on by the defendant with a conscious disregard for the rights of others."

Appellant asserts this instruction constituted prejudicial error in that, even apart from Civil Code section 48a, the law under the circumstances present requires that punitive damages may not be awarded to a public figure without proof of the publisher's hatred or ill will by clear and convincing evidence. Stated another way, appellant maintains that a "standard" of proof expressed in the trial court's "intended-conscious disregard" language, and a "burden" of proof based on a preponderance of the evidence, are inadequate in any libel case of the type present here. Support for the proposition, in appellant's view, is found in *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323 and from the other cases similar to it which are cited above.

We are of the opinion that in so contending appellant is mistaken. As can be ascertained from what we have set out above, the "actual malice" required by *New York Times* to be established by "clear and convincing evidence" refers to that aspect of malice, properly denominated malice in law, necessary to find liability for libel and not to malice in fact, essential to the recovery of punitive damages, which under the cases discussed may be arrived at on the basis of applicable state standards, here on the basis of a preponderance of the evidence. (See *Cantrell* v. *Forest City Pub. Co.* (1974) 419 U.S. 245, 251-252 [42 L.Ed.2d 419, 426, 95 S.Ct. 465]; cf. *Smith* v.

*Wade* (1983) 461 U.S. 30 [75 L.Ed.2d 632, 103 S.Ct. 1625].[8]) Moreover, as also appears from what we have said, the definition of malice in fact is not controlled by *New York Times* or its progeny, but is instead that articulated in *Davis* v. *Hearst,* namely, "the motive and willingness to vex, harass, annoy, or injure" or the "*'malus animus*—indicating that the party was actuated either by spite or ill-will towards an individual, or by indirect or improper motives, though these may be wholly unconnected with any uncharitable feeling towards anybody.'" (*Davis* v. *Hearst, supra,* 160 Cal. 143, at pp. 162, 164, *id.,* at pp. 162, 164, quoting from *Hicks* v. *Faulkner,* 8 Q.B. Div. 167), a standard which we think was adequately conveyed by the trial court's instruction.[9]

---

[8]"[Appellant] argues that the deterrent and punitive purposes of punitive damages are served only if the threshold for punitive damages is higher in every case than the underlying standard for liability in the first instance. . . .

". . .The argument overlooks a key feature of punitive damages—that they are never awarded as of right, no matter how egregious the defendant's conduct. . . .

". . .There has never been any general common-law rule that the threshold for punitive damages must always be higher than that for compensatory liability." (*Smith* v. *Wade, supra,* (1983) 461 U.S. 30, at pp. 51-53 [75 L.Ed.2d 632 at pp. 648-649].)

In the matter before us, of course, the "threshold" for punitive damages may be viewed as dependent both upon the substantive finding of conscious, as opposed to reckless, disregard, and upon the degree of proof—preponderance versus clear and convincing—necessary to support the finding. Whether conscious disregard found from a preponderance of evidence constitutes a *higher* threshold than reckless disregard found from clear and convincing evidence, we are satisfied the two are sufficiently similar that the application of the former, even in a context involving First Amendment issues, was justified.

[9]In *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890 [157 Cal.Rptr. 693, 598 P.2d 894], a case involving punitive damages in a personal injury action brought against an intoxicated driver it was recited that:

"Section 3294 of the Civil Code authorizes the recovery of punitive damages in noncontract cases 'where the defendant has been guilty of oppression, fraud, or malice, express or implied. . . .' As we recently explained, 'This has long been interpreted to mean that malice in fact, as opposed to malice implied by law, is required. [Citations.] The malice in fact, referred to . . . as animus malus, may be proved under section 3294 either expressly (by direct evidence probative on the existence of hatred or ill will) or by implication (by indirect evidence from which the jury may draw inferences). [Citation.]' (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 66 . . . .)

"Other authorities have amplified the foregoing principle. Thus it has been held that the 'malice' required by section 3294 'implies an act conceived in a spirit of mischief or with criminal indifference towards the obligations owed to others.' (*Ebaugh* v. *Rabkin* (1972) 22 Cal.App.3d 891, 894 . . .; see *Gombos* v. *Ashe* (1958) 158 Cal.App.2d 517, 527 . . .; Stein, Damages and Recovery (1972) Nominal and Punitive Damages, § 186, at p. 369; Prosser, Law of Torts (4th ed. 1971) § 2, at pp. 9-10.) In Dean Prosser's words: 'Where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award in the tort action "punitive" or "exemplary" damages. . . . [¶] Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, *or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton.*' (*Ibid.,* fns. omitted, italics added.)

"Defendant's successful demurrer to the complaint herein was based upon plaintiff's failure to allege any actual intent of defendant to harm plaintiff or others. Is this an essential

It is next contended, however, that regardless of what we have just said, the punitive damages assessed herein are still legally unsupportable. More specifically it is urged (a) the amount of those damages was grossly excessive; (b) such damages were impermissibly disproportionate to the compensatory damages awarded; (c) that the trial court erred in revising the ratio between punitive and compensatory damages on its remittitur; and (d) that insufficient evidence was present which would show appellant ratified the acts of its employees, so as to justify its liability for punitive damages under Civil Code section 3294, subdivision (b).[10]

■ In addressing the claims that the penalty award was excessive and disproportionate, we accept as reiterative of settled principles those observations related in *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 927-928 [148 Cal.Rptr. 389, 582 P.2d 980] (fns. omitted) to the effect that:

"As we pointed out in *Bertero* v. *National General Corp., supra,* 13 Cal.3d 43, our review of punitive damage awards rendered at the trial level is guided by the 'historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice. . . .' (13 Cal.3d at p. 65, fn. 12.) Stating the matter somewhat differently in a similar case, we indicated that an appellate court may reverse such an award 'only " "[w]hen the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice.' " ' (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 919 . . . .)

"In making the indicated assessment we are afforded guidance by certain established principles, all of which are grounded in the purpose and function

element of a claim for punitive damages? As indicated by Dean Prosser, courts have not limited the availability of punitive damages to cases in which such an intent has been shown. As we ourselves have recently observed, in order to justify the imposition of punitive damages the defendant ' ". . . must act with the intent to vex, injure, or annoy, *or with a conscious disregard of the plaintiff's rights.* [Citations.]" ' (Italics added; *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 . . ., quoting from *Silberg* v. *California Life Ins. Co.* (1977) 11 Cal.3d 452, 462 . . .; accord, *Seimon* v. *Southern Pac. Transportation Co.* (1977) 67 Cal.App.3d 600, 607 . . .; *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22 . . .)" (*Id.,* at pp. 894-895; see also *Cantrell* v. *Forest City Pub. Co., supra,* 419 U.S. 245, 251-252 [42 L.Ed.2d 419, 426]; cf. *Roemer* v. *Retail Credit Co.* (1975) 44 Cal.App.3d 926 [119 Cal.Rptr. 82]; *Field Research Corp.* v. *Patrick* (1973) 30 Cal.App.3d 603 [106 Cal.Rptr. 473].)

[10]The statute provides in pertinent part that: "An employer shall not be liable for [punitive] damages . . . based upon acts of an employee of the employer, unless the employer . . . ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the . . . ratification, or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation."

of punitive damages. One factor is the particular nature of defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. (See *Bertero v. National General Corp., supra,* 13 Cal.3d 43, 65; *Fletcher v. Western National Life Ins. Co., supra,* 10 Cal.App.3d 376, 408-409; *Ferraro v. Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 352-353.) Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small. (But cf. *Finney v. Lockhart* (1950) 35 Cal.2d 161, 164.) Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. (See *Bertero, supra,* at p. 65; *Roemer v. Retail Credit Co.* (1975) 44 Cal.App.3d 926, 937 . . .; *Wetherbee v. United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270-271 . . .; *Ferraro v. Pacific Fin. Corp., supra,* 8 Cal.App.3d 339, 353; *MacDonald v. Joslyn* (1969) 275 Cal.App.2d 282, 293-294 . . . .) By the same token, of course, the function of punitive damages is not served by an award which in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter.'' (See also *Roemer v. Retail Credit Co., supra,* 44 Cal.App.3d 926, 937; *Wetherbee v. United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 271 [95 Cal.Rptr. 678].)

We likewise accept the proposition it is our duty to intervene in instances where punitive damages are so palpably excessive or grossly disproportionate as to raise a presumption they resulted from passion or prejudice. (See *Rosener v. Sears, Roebuck & Co.* (1980) 110 Cal.App.3d 740, 749-750 [168 Cal.Rptr. 237]; *Zhadan v. Downtown L. A. Motors* (1976) 66 Cal.App.3d 481, 496 [136 Cal.Rptr. 132].)

Viewing the record in the light of these principles, and assuming, as we will hereinafter decide, that the award of compensatory damages was proper, we are of the opinion the award to respondent of $750,000 in order to punish and deter appellant was not justified.

In so concluding, we are persuaded the evidence fairly showed that while appellant's representatives knew that part of the publication complained of was probably false and that the remainder of it in substance might very well be, appellant was nevertheless determined to present to a vast national audience in printed form statements which in their precise import and clear implication were defamatory, thereby exposing respondent to contempt, ridicule and obloquy and tending to injure her in her occupation.

 We are also satisfied that even when it was thought necessary to alleviate the wrong resulting from the false statements it had placed before the public, the retraction proffered was evasive, incomplete and by any standard, legally insufficient.[11] (See *Turner* v. *Hearst* (1896) 115 Cal. 394, 402-403 [47 P. 129]; *Behrendt* v. *Times-Mirror Co.* (1938) 30 Cal.App.2d 77, 88 [85 P.2d 949].) In other words, we have no doubt the conduct of appellant respecting the libel was reprehensible and was undertaken with the kind of improper motive which supports the imposition of punitive damages.

Nevertheless, evidence on the point of appellant's wealth adequately established appellant's net worth to be some $2.6 million and its net income for the period under consideration to be about $1.56 million, such that the penalty award, even when substantially reduced by the trial court based on its conclusion the jury's compensatory verdict was "clearly excessive and . . . not supported by substantial evidence," continued to constitute about 35 percent of the former and nearly half the latter.

Such being the case, and in the effort required of us to find acceptable only that balance between the gravity of a defendant's illegal act and a penalty necessary to properly punish and deter such unlawful conduct as will serve the function of punitive damages, we hold the exemplary award herein to be excessive, and require either that it be reduced to the sum of $150,000 or that appellant be granted a new trial on that issue. (See *Rosener* v. *Sears, Roebuck & Co., supra,* 110 Cal.App.3d 740, 757.)

Having so decided, it is unnecessary for us to address appellant's further contention the trial court was bound on its remittitur, at least as to an upper limit of punitive damages, to the ratio of damages established by the jury.[12]

---

[11]The retraction appeared as the eighth item of a ten-item gossip column, whereas the libelous item was contained as the fourth item. The headline to the gossip column containing the retraction failed to make any reference to the retraction although the defamatory item was highlighted by a large headline at the top of the column. Even though the original defamatory item was further emphasized by its placement adjacent to a picture of Barbara Walters, the retraction was not placed next to a picture of a prominent celebrity. The purported retraction was also substantially shorter and occupied less column space than the original item. It repeated the substance of some of the defamatory statements while failing to refer to others. Most notably, it never stated that Carol Burnett was not inebriated. By inference it suggested that only the few published statements were false while the rest must have been true. It equivocated by ambiguously stating "we understand" that the events did not occur.

[12]We are sensitive to the fact that all facets of defamation law since the *New York Times* case have been under the rigid scrutiny of the Supreme Court of the United States for the purpose of reconciling the common law and/or state law of defamation with the guarantees of the First Amendment.

In effecting that reconciliation, the high court has announced significant changes with respect to the rule of liability and the need of clear and convincing evidence to establish

■ We also summarily reject the claim the malice in fact established herein should not have been attributed to appellant, since it is clear to us from the record the acts of the individuals involved in publishing the defamatory statements were ratified in accordance with the requirements of Civil Code section 3294, subdivision (b). (See fn. 10.)

*Was there error associated with the award to respondent of $50,000 compensatory damages? No.*

We have previously recited those considerations, both legal and factual, which underlie our conclusion appellant's liability herein was established upon clear and convincing evidence. It remained nevertheless for respondent to establish the actual damage she had suffered as a result of the publication involved. Whether such damage necessarily encompassed both special and general damages was a matter dependent upon whether the publication was or was not libelous on its face, in accordance with Civil Code section 45a which provides that: "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. Special damage is defined in section 48a of this code."

■ That what was printed here was libelous on its face seems abundantly clear, in that the message conveyed was that respondent had been boisterous and loudly argumentative in a public dining place, had "traipsed" around the restaurant sharing part of her dinner indiscriminately, and had "raised eyebrows" when she boorishly giggled instead of apologizing after spilling wine on another, a message which reasonably carried the implication respondent's actions were the result of some objectionable state of inebriation. Nor is the character of the publication altered by the consideration it might have been interpreted innocently.

■ "The fact that an implied defamatory charge or insinuation leaves room for an innocent interpretation as well does not establish that the defamatory meaning does not appear from the language itself. The language used may give rise to conflicting inferences as to the meaning intended, but when it is addressed to the public at large, it is reasonable to assume that

---

liability. It has announced too substantial restrictions respecting the recovery of damages where the *New York Times* standard for liability is not adhered to. (See *Gertz* v. *Robert Welch, Inc., supra*, 418 U.S. 323, 349-350 [41 L.Ed.2d 789, 810-811].) But while a review of the decisions of that court on the subject reveals a wide spectrum of opinion concerning the propriety of punitive damages in instances like the one before us, we do not find in any of these authorities an announcement of definitive principles which a state must apply to awards of such damages when, as here, the *New York Times* test has been satisfied. We have therefore applied the law of this state on that question, as we perceive it to be.

at least some of the readers will take it in its defamatory sense. . . . [¶] It would be a reproach to the law to hold that a defendant intent on destroying . . . reputation . . . could achieve his purpose without liability by casting his defamatory language in the form of an insinuation that left room for an unintended innocent meaning." (*MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 549, 551 [343 P.2d 36]; *Fairfield* v. *Hagan* (1967) 248 Cal.App.2d 194, 200-201 [56 Cal.Rptr. 402].)

■■■■ Accordingly, it was incumbent upon respondent to show only those general damages caused by appellant's wrong, i.e., damages arising from respondent's loss of reputation, shame, mortification and injured feelings. In this regard her own testimony was to the following effect:

"Q. When was the first time that you had any knowledge of that article or the contents of that article?

"A. I believe it was the day that it came out. . . .

"Q. What was your reaction?

"A. Well, I was absolutely—I was stunned. . . . I felt very, very angry. I started to cry. I started to shake.

"Q. Why such a reaction to this [article]?

"A. Well, it portrays me as being drunk. It portrays me as being rude. It portrays me as being uncaring. It portrays me as being physically abusive. It is disgusting, and it is a pack of lies. I—It hurts. It hurts, because words, once they are printed, they've got a life of their own. Words, once spoken, have a life of their own. How was I going to explain to my kids, my family, the people I care about? How am I going to go talk to do things . . . against alcoholism? . . .

"Q. [Y]ou mentioned something about work against alcoholism. What is that?

"A. It didn't start out as any kind of a crusade at all. I think I must have spoken about it many years ago, first maybe in a magazine article for McCall's or Redbook or Ladies' Home Journal, or something like that, when, in a sense, I came out of the closet about my parents. I told about my background.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"Then I was asked about it on a few talk shows, and then I started getting

requests to do various public service things relating to abuse of alcohol, which I was very happy to do.

"Q. And you have done a number of public service things—

"A. Yes.

"Q. —relating to abuse of alcohol?

"A. Yes.

"Q. Now, when you first heard about this article, when you first heard what the article said, I take it, from what you said, that you at least interpreted the language of the article as inferring that you were intoxicated?

"A. I think anyone who can read would.

"Q. And your reaction—one of the reactions you had—we are not talking about now, but at the time you heard about this article, one of the reactions you had was, as you described it, related to this work that you had been doing, the—let's say image, for lack of a better word, the image that you have in respect to this working against abuse of alcohol?

"A. Yes. I mean, it hurts. If you think you are going to get up there and talk to somebody and say, 'Hey, you know, there is a way, there is cure for this, and people have been cured—' If I get up and talk about that and somebody having read that or heard about it says, 'Who is she to get up there and tell me what to do, she runs around having fights with people and throws wine on them,' I mean, what—You see what I'm getting at? I tell you what really hurts is that I know—I really know that most people believe what they read. And that hurts.

"Q. What did you—And I preface this by saying, and obviously you know it already, that we have to describe the feelings that you had, both physical and mental, at the time you found out about this article. What did you feel like physically, if anything different than usual?

"A. Well, I don't think I would be different from anybody else, if anyone in here just put their name on that. Some people might get a headache. My stomach just went back and forth, and did flip flops. My stomach did flip flops. I cried. When you cry and your stomach does that, your heart pounds real fast. You shake. You cry. You calm down, you cry; you calm down, then you start thinking about all the ramifications, about, 'Oh, my God, should I call my kids? Are they going to hear about this in school or should I talk to them about it and say, 'Hey, it didn't happen'? Should I call my

relatives? What should I do? Should I ignore anything that anybody is going to say to me today? But what am I going to do tomorrow?'. . .

"Q. Was the article that had been read to you still on your mind as you were walking to rehearsal?

"A. Yes.

"Q. Did anything unusual happen to you during the time you were walking?

"A. I was crossing the street and a cab driver yelled out at me and said, 'Hey, Carol, I didn't know you liked to get into fights.'

"Q. This, apparently, obviously, was a person that you did not know?

"A. No. It was a cab driver. . . .

"Q. Does the article still concern you?

"A. Yes.

"Q. Why is that? . . .

"[A] When I am dead and gone, it's going to be in my files. My kids, my grandchildren, great-grandchildren, whatever—everybody's got a file on people, library, if you will—they can look that up. And unless—it's always going to be with me."

■ The foregoing, in our view, when combined with the further evidence of respondent's prominence in the public eye, her professional standing and the fact the National Enquirer is read by some 16 million persons, was sufficient to support an award of $50,000 in compensatory damages.[13] (See *Scott* v. *Times-Mirror Co.* (1919) 181 Cal. 345, 365 [184 P. 672, 12 A.L.R. 1007]; *Douglas* v. *Janis* (1974) 43 Cal.App.3d 931, 940 [118 Cal.Rptr. 280]; see also *Allard* v. *Church of Scientology* (1976) 58 Cal.App.3d 439, 450 [129 Cal.Rptr. 797].)

---

[13]It is also urged by appellant it was improper for the trial court to instruct the jury it could consider respondent's particular susceptibilities and circumstances in arriving at actual damages. If there were error in that respect, we deem it harmless in light of the evidence adduced on the issue. (Cal. Const., art. VI, § 13.)

*Was there any other reversible error present in the matter? No.*

Finally it is maintained the trial court committed prejudicial error in its rulings respecting two incidents which occurred during the course of the trial.

In the first of these, as an accommodation to respondent's lawyer, counsel for appellant, in the presence of the jury, read aloud the following from deposition testimony.

"Q. Do you have any agreement at this time with the National Enquirer as to any possible liability that you may have concerning this article, such as an indemnification agreement?

"A. Yes, obliquely, I have been told.

"I believe, although I do not specifically remember, although I think I specifically remember Iain Calder, the editor and chief of the National Enquirer, told me that I would be in no way held personally reliable [*sic*] and that we have insurance. . . .

"And to this day everything that is written in the column is covered—"

There then transpired the following exchange between the trial court and counsel for the parties.

"[Counsel for Appellant:] I have to move for a mistrial on behalf of all of my clients. There has been reference to insurance. The incredibly embarrassing thing for me professionally and ethically is that I was the instrumentality, if you will, of exposing this.

"The Court: Well unfortunately, you know, I guess all of us—this can happen to all of us. . . .

"And I can give—I'm going to deny the motion for a mistrial, but I'm going to—If you want, I can give an admonition that I think is contained in BAJI 1.04, or whatever the appropriate number is. I'd be happy to do that.

"Sometimes that calls undue attention to it. Whatever your pleasure is. I can cover it that way. . . .

"So why don't we just have a stipulation that there was no insurance or something like that.

"[COUNSEL FOR APPELLANT:] Well, I'm sure not trying to be difficult, because I'd love to have this done. . . .

"[COUNSEL FOR RESPONDENT:] How about just telling them that they should ignore the last comment?

" 'There is no insurance applicable to this case.' "

"[COUNSEL FOR APPELLANT:] Well, I'd sure like to tell them for their purposes there is no insurance that is applicable to this case; that the witness was in error.

"THE COURT: Fine."

The trial court then advised the jury what they had heard was erroneous and that there "was no insurance in the case."

We find no error in this of which appellant may complain. Having joined in fashioning the corrective admonition, it cannot now be heard to say the cure was worse than the disease (cf. *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 50 [123 Cal.Rptr. 468, 539 P.2d 36]), and had nothing further been said to the triers of fact, the disclosure described would not have warranted a mistrial. (See *Packard* v. *Moore* (1937) 9 Cal.2d 571, 580 [71 P.2d 922].)

 In the second incident referred to, at least a number of the jurors became aware of a verbal denunciation of the National Enquirer by television star Johnny Carson on his program "The Tonight Show," wherein he asserted essentially that the publication was composed of fabrications authored by liars. After examining each juror concerning the effect of the tirade on the juror's ability to participate in a fair and impartial trial and being satisfied in the premises, the trial court excused two of the triers of fact, seated the only available alternate, and proceeded with a panel of eleven, from which it was agreed nine could determine the cause. No more was required. (See *People* v. *Manson* (1977) 71 Cal.App.3d 1, 28 [139 Cal.Rptr. 275]; *People* v. *Byers* (1970) 10 Cal.App.3d 410, 416 [88 Cal.Rptr. 886]; *People* v. *Blackwell* (1967) 257 Cal.App.2d 313, 321-323 [64 Cal.Rptr. 642].)

The judgment is affirmed except that the punitive damage award herein is vacated and the matter is remanded for a new trial on that issue only, provided that if respondent shall, within 30 days from the date of our remittitur, file with the clerk of this court and serve upon appellant a written consent to a reduction of the punitive damage award to the sum of $150,000, the

judgment will be modified to award respondent punitive damages in that amount, and as so modified affirmed in its entirety. (*Rosener* v. *Sears Roebuck & Co., supra,* 110 Cal.App.3d 740, 757.) Each party to bear her or its costs on appeal.

Gates, J., concurred.

**BEACH, J.**—I concur in the affirmance of the judgment, but I dissent from that part of the majority opinion reducing the award of punitive damages.

Our decision in *Allard* v. *Church of Scientology* (1976) 58 Cal.App.3d 439 [129 Cal.Rptr. 797] fully supports the majority view herein. But I am now convinced it was a mistake in *Allard* to have uncritically applied the rule and majority view of *Cunningham* v. *Simpson* (1969) 1 Cal.3d 301 [81 Cal.Rptr. 855, 461 P.2d 39], thus resulting in a reduction of the punitive damages in *Allard*. Unlike Dr. Frankenstein, we did not create a "monster." Nonetheless by our *Allard* decision we helped nurture an improper and growing practice in the appellate courts to reduce punitive damages simply because of some sort of "disproportion." While consistent with established case law, I believe the practice needs limiting if it is not in fact error.

The weakness in *Allard* and in the present majority opinion is its undue weight and emphasis on the presumption that just because an award of punitive damages is a certain percentage greater than actual damage it must have been a result of passion and prejudice. I think such a presumption is a non sequitur. In each case it is just as probable that the verdict was the result of fair, honest, cool and dispassionate deliberations of the jury concluding that it would take at least that much money to teach the defendant a lesson and to insure that it will not offend again.

In reducing a jury's award of punitive damages, the court is in effect reweighing the evidence, which is a function of the jury and should be interfered with only upon a clear and convincing showing that the jury was driven by passion and prejudice. Interference with the jury's award should not rest upon indulging in a presumption based merely on comparing punitive and compensatory damages nor merely upon an award which to the appellate court's mind is "too much." As Justice Mosk stated in his dissent in *Cunningham* v. *Simpson, supra,* 1 Cal.3d 301, 311-312: "Part of the damages awarded here were punitive. Again, the law on this subject is clear. '[The jury's estimate] of what would be sufficient as a punishment and a deterrent and an example was very high as compared with the actual damages assessed and high from any point of view, but it would hardly be candid to invite them . . . to fix such sum which expressed their judgment

in such matter, and then charge them with bias or perversity because the measure of their abhorrence of defendant's conduct and their judgment of what would be a sufficient punishment and deterrent was represented by a larger sum of money than that which some other man or men would have allowed.' (*Di Giorgio Fruit Corp.* v. *AFL-CIO* (1963) *supra,* 215 Cal.App.2d 560, 581, quoting *Scott* v. *Times-Mirror Co.* (1919) 181 Cal. 345, 367 [184 P. 672, 12 A.L.R. 1007].)"

Admittedly, some of the foregoing considerations apply equally to an award made or resulting from a reduction by a trial judge alone as well as to an award made by a jury. But it must be remembered that our inquiry at bench is not into the motives of the jury. Rather, our inquiry is whether the trial court erred in reducing the amount of punitive damages from that which the jury had fixed. The act of the trial court appears to have been an attempt to be moderate. Reducing an award of punitive damages from $1.3 million to $750,000 does not seem to me to be an act of passion or prejudice. In the absence of a showing by appellant that the reduction was the result of bias by the trial court, its determination must be upheld on appeal.

In assessing the correct amount of punitive damages, of equal importance as the majority's view of proportionality based on comparison of compensatory damages are the facts considered and expressly relied on by the trial court at bench in reducing and fixing the amount of punitive damages in denying the motion for new trial. Among these are: "[t]he conduct of the defendant was highly reprehensible, . . . [was a] fabrication and reckless disregard; . . . [f]ailure by top management to publish an adequate correction is substantial evidence of malice and bad faith; . . . defendant's net worth amounted to approximately $2,600,000 and it had earnings of $1,300,000 after taxes for the last ten month period; . . . the defendant has absolutely no remorse for its misdeeds; . . . it is the policy of the National Enquirer to publish two or three unflattering articles about celebrities every week; . . . [t]he defendant engages in a form of legalized pandering designed to appeal to the readers' morbid sense of curiousity[;] [t]his style of journalism has been enormously profitable to the defendant; . . . [a]n award of $1,300,000 will probably not amount to 'capital punishment' (bankruptcy), . . . because of the defendant's strong cash position."

The fact is that this is a publication read nationally by 16 million people. The potential for harm through a repetition of a libel by such an institution is tremendous. There are others to be protected from the harm. If the risk to an intentional wrongdoer that he will be adequately punished is slight, the defendant may well chance it again. It can in effect "write it off" as an expense or cost of doing business. Thus punitive damages need to be more than "an expense" item or "cost of doing business" which the defendant

can calculate and absorb. In a case such as this, reference to the ratio of compensatory to punitive damages, such as emphasized in the majority opinion, is neither helpful nor relevant. (*Vossler* v. *Richards Manufacturing Co.* (1983) 143 Cal.App.3d 952 [192 Cal.Rptr. 219].) Perhaps some cases lend themselves to comparison of various ratios. I think most do not. Ratio examination of the amount of compensatory damage to amount of punitive damage does not really tell us what is necessary to teach a defendant, such as the one at bench, not to abuse its privilege of the freedom of the press. On the other hand, considerations of punitive damage to defendant's wealth may be more germane. As stated in *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980]: "Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort." Yet to reduce the award from $750,000 to $150,000, as suggested by the majority in this case would do just that.

I would affirm the trial judge's determination of the proper amount of punitive damages.

Petitions for a rehearing were denied August 11, 1983. Beach, J., was of the opinion that the respondent's petition should be granted. The petitions of both parties for a hearing by the Supreme Court were denied October 6, 1983. Bird, C. J, was of the opinion that the respondent's petition should be granted.